# UNITED STATES *v.* CHAVEZ ET AL.

No. 72–1319. Argued January 8, 1974—Decided May 13, 1974

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, STEWART, and MARSHALL, JJ., joined, *post*, p. 580.

*Solicitor General Bork* argued the cause for the United States. With him on the brief were *Assistant Attorney*

*General Petersen, Harriet S. Shapiro,* and *Sidney M. Glazer.*

*James F. Hewitt* argued the cause and filed a brief for respondents.

MR. JUSTICE WHITE delivered the opinion of the Court.

This case, like *United States* v. *Giordano, ante,* p. 505, concerns the validity of procedures followed by the Justice Department in obtaining judicial approval to intercept wire communications under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 211–225, 18 U. S. C. §§ 2510–2520, and the propriety of suppressing evidence gathered from court-authorized wiretaps where the statutory application procedures have not been fully satisfied. As is more fully described in *Giordano,* Title III limits who, among federal officials, may approve submission of a wiretap application to the appropriate district court, to the Attorney General, or an Assistant Attorney General he specially designates, 18 U. S. C. § 2516 (1), and delineates the information each application must contain, upon what findings an interception order may be granted, and what the order shall specify, 18 U. S. C. §§ 2518 (1), (3), (4).[1] Within this general framework, two statutory requirements are of particular relevance to this case. Section 2518 (1)(a) provides that each application for a court order authorizing or approving the interception of a wire or oral communication shall include, among other information, "the identity of the . . . officer authorizing the application." Similarly, § 2518 (4)(d) provides that the order of authorization or approval itself shall specify, in part, "the identity of . . . the person authorizing the appli-

---

[1] The relevant statutory provisions are set forth in the Appendix to *United States* v. *Giordano, ante,* p. 534.

cation." The specific question for adjudication here, which it was unnecessary to resolve in *Giordano*, is whether, when the Attorney General has in fact authorized the application to be made, but the application and the court order incorrectly identify an Assistant Attorney-General as the authorizing official, evidence obtained under the order must be suppressed. We hold that Title III does not mandate suppression under these circumstances.

I

Respondents were all indicted for conspiracy to import and distribute heroin in violation of 21 U. S. C. §§ 173, 174 (1964 ed.). In addition, respondent Umberto Chavez was separately charged under 18 U. S. C. § 1952 with using and causing others to use a telephone between California and Mexico, and performing other acts, in order to facilitate unlawful narcotics activity, and respondent James Fernandez was charged under § 1952 with traveling between California and Mexico, and performing other acts, for the same purpose. Upon notification that the Government intended to introduce evidence obtained from wiretaps of Chavez' and Fernandez' phones at trial, respondents filed motions to suppress, challenging the legality of the Justice Department's application procedures leading to the issuance by the District Court of the two orders permitting the wire interceptions. Affidavits filed in opposition by the Attorney General and his Executive Assistant represented that the application submitted for the February 18, 1971, order authorizing interception of wire communications to and from the Chavez phone had been personally approved by the Attorney General, whereas the application for the February 25, 1971, order to intercept communications to and from the Fernandez phone had been approved by his Executive Assistant at a time when the Attorney General

was unavailable, and pursuant to an understanding that the Executive Assistant, applying the Attorney General's standards as he understood them, could act for the Attorney General in such circumstances.

Each application to the court had recited, however, that the Attorney General, pursuant to 18 U. S. C. § 2516, had "specially designated" the Assistant Attorney General for the Criminal Division, Will Wilson, "to authorize [the applicant attorney] to make this application for an Order authorizing the interception of wire communications." Moreover, appended to each application was a form letter, addressed to the attorney making the application and purportedly signed by Will Wilson, stating that the signer had reviewed the attorney's request for authorization to apply for a wiretap order pursuant to 18 U. S. C. § 2518 and had made the requisite probable-cause and other statutory determinations from the "facts and circumstances detailed" in the request, and that "you are hereby authorized under the power specially delegated to me in this proceeding by the Attorney General . . . , pursuant to the power conferred on him by Section 2516 . . . to make application" for a wire interception order. Correspondingly, the District Court's intercept order in each case declared that court approval was given "pursuant to the application authorized by . . . Will Wilson, who has been specially designated in this proceeding by the Attorney General . . . John N. Mitchell, to exercise the powers conferred on the Attorney General" by § 2516.

The discrepancy between who had actually authorized the respective applications to be made, and the information transmitted to the District Court clearly indicating that Assistant Attorney General Wilson was the authorizing official, was explained as the result of a standard procedure followed within the Justice Department.

While the Attorney General had apparently refrained from designating any Assistant Attorney General to exercise the authorization power under § 2516 (1), form memoranda were routinely sent from his office, over his initials, to Assistant Attorney General Wilson, stating that "with regard to your recommendation that authorization be given" to make application for a court order permitting wire interception, "you are hereby specially designated" to exercise the power conferred on the Attorney General by § 2516 "for the purpose of authorizing" the applicant attorney to apply for a wiretap order. Evidently, this form was intended to reflect notice of approval by the Attorney General, though on its face it suggested that the decision whether to authorize the particular wiretap application would be made by Assistant Attorney General Wilson. In fact, as revealed by the affidavits of Wilson's then Deputy Assistants filed in opposition to respondents' suppression motions, "Wilson did not examine the files or expressly authorize the applications" for either the February 18 or February 25 interception orders, and they signed his name "in accordance with [his] authorization . . . and the standard procedures of the Criminal Division" to the respective letters of authorization to the applicant attorney, which were made exhibits to the applications. The signing of Wilson's name was regarded as a "ministerial act" because of Wilson's authorization to his Deputies "to sign his name to and dispatch such a letter of authorization in every instance in which the request had been favorably acted upon in the Office of the Attorney General."

The District Court held that the evidence secured through both wiretaps had to be suppressed for failure of either of the individuals who actually authorized the applications to be "identified to Chief Judge Carter, Congress or the public" in the application or orders, as

mandated by §§ 2518 (1)(a) and (4)(d), respectively. Moreover, evidence obtained under the February 25 wiretap order on the Fernandez phone was separately suppressed, because the Government admitted that "neither the Attorney General nor a specially designated Assistant Attorney, General ever authorized the application," as § 2516 (1) requires.

The Court of Appeals affirmed in all respects. 478 F. 2d 512. With respect to the Chavez tap, the Court of Appeals assumed, as had the District Court, that the Attorney General had personally approved the request for authority to apply for the interception order, as his affidavit stated. Nonetheless, the misidentification of Assistant Attorney General Wilson as the authorizing official was deemed to be a "misrepresentation" and an "apparently deliberate deception of the courts by the highest law officers in the land," *id.*, at 515, 517, which required suppression of evidence gathered from the tap for failure to comply with 18 U. S. C. §§ 2518 (1)(a) and (4)(d). Congress was held to have "intended to eliminate any possibility that the authorization of wiretap applications would be institutional decisions," and the Court of Appeals was fearful that if the misidentification which occurred in this case were approved, "there would be nothing to prevent future Attorneys General from remaining silent if a particular wiretap proved embarrassing." 478 F. 2d, at 516.

We granted certiorari, 412 U. S. 905, to resolve the conflict between the position taken by the Ninth Circuit in this case on the issue of suppression because of inaccurate identification of the officer authorizing the application and the position taken by every other circuit that has considered the question.[2] We agree with those other

---

[2] In other instances where the Attorney General had personally authorized the application, but the application and order erroneously

courts of appeals that misidentifying the Assistant Attorney General as the official authorizing the wiretap application to be made does not require suppression of wiretap evidence when the Attorney General himself has actually given the approval; hence, we reverse that portion of the judgment suppressing the Chavez wiretap evidence, and remand for further proceedings to permit the District Court to address other challenges to the Chavez wiretap evidence which respondents had made but the District Court did not find it necessary to consider.[3] Because

recited approval by Assistant Attorney General Wilson, suppression of wiretap evidence has been denied on the ground of substantial compliance with Title III requirements. *United States* v. *James*, 161 U. S. App. D. C. 88, 98, 494 F. 2d 1007, 1017 (1974) ("immaterial variance"); *United States* v. *Pisacano*, 459 F. 2d 259, 264 n. 5 (CA2 1972) ("discrepancy did not meaningfully subvert the congressional scheme"); *United States* v. *Becker*, 461 F. 2d 230, 235 (CA2 1972) ("harmless error"); *United States* v. *Ceraso*, 467 F. 2d 647, 652 (CA3 1972) ("subsequent identification of the authorizing officer is satisfactory"); *United States* v. *Bobo*, 477 F. 2d 974, 985 (CA4 1973) ("sufficient compliance"); *United States* v. *Cox*, 462 F. 2d 1293, 1300 (CA8 1972) ("it is irrelevant that the application and order recited the authorizing officer as Mr. Wilson rather than Mr. Mitchell"). See also *United States* v. *Roberts*, 477 F. 2d 57, 59 (CA7 1973), holding the authorization improper because given by the Executive Assistant, not the Attorney General, but suggesting that with respect to the misidentification of Assistant Attorney General Wilson "we would not be inclined to elevate form over substance to find a violation of 18 U. S. C. § 2518 (1) (a) and (4) (d) . . . ."

[3] The record discloses that respondents also based their motions to suppress the Chavez wiretap evidence on the failure of the Government's affidavits in support of the wiretap application to demonstrate a need for wiretapping as opposed to less intrusive means of investigation, 18 U. S. C. § 2518 (1) (c), to particularly describe the communications sought to be intercepted, § 2518 (1) (b) (iii), to allege facts sufficient to justify the uncertainty of the termination date for the interception, § 2518 (1) (d), or to adequately show probable cause to support the order, § 2518 (3); moreover, the

the application for the interception order on the Fernandez phone was authorized by the Attorney General's Executive Assistant, rather than by the Attorney General or any specially designated Assistant Attorney General, on whom alone 18 U. S. C. § 2516 (1) confers such power, evidence secured under that order was properly suppressed for the reasons stated in the opinion filed today in *United States* v. *Giordano, ante,* p. 505. Accordingly, that portion of the judgment suppressing the Fernandez wiretap evidence is affirmed.

## II

The application and order for the Chavez wiretap did not correctly identify the individual authorizing the application, as 18 U. S. C. §§ 2518 (1)(a) and (4)(d) require. Of this there is no doubt. But it does not follow that because of this deficiency in reporting, evidence obtained pursuant to the order may not be used at a trial of respondents. There is no claim of any constitutional infirmity arising from this defect, nor would there be any merit to such a claim, and we must look to the statutory scheme to determine if Congress has provided that suppression is required for this particular procedural error.

Section 2515 provides that the contents of any intercepted wire or oral communication, and any derivative evidence, may not be used at a criminal trial, or in certain other proceedings, "if the disclosure of that information would be in violation of this chapter."

---

sufficiency of the order's directive to minimize the interception of innocent conversations and compliance by the agents who conducted the wiretap with the order of minimization, § 2518 (5), were also challenged. R. 159–197. None of these questions is before us now, as neither the District Court nor the Court of Appeals passed on any of them.

Aggrieved persons may move, in a timely manner under § 2518 (10)(a), to suppress the use of such evidence at trial on the grounds that .

> "(i) the communication was unlawfully intercepted; .
>
> "(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
>
> "(iii) the interception was not made in conformity with the order of authorization or approval."

In *United States* v. *Giordano, supra,* we have concluded that Congress, in 18 U. S. C. § 2516 (1), made preliminary approval of submission of wiretap applications a central safeguard in preventing abuse of this means of investigative surveillance, and intentionally restricted the category of federal officials who could give such approval to only the Attorney General himself or any Assistant Attorney General he might specially designate for that purpose. Hence, failure to secure approval of one of these specified individuals prior to making application for judicial authority to wiretap renders the court authority invalid and the interception of communications pursuant to that authority "unlawful" within the meaning of 18 U. S. C. § 2518 (10)(a)(i). Failure to correctly report the identity of the person authorizing the application, however, when in fact the Attorney General has given the required preliminary approval to submit the application, does not represent a similar failure to follow Title III's precautions against the unwarranted use of wiretapping or electronic surveillance and does not warrant the suppression of evidence gathered pursuant to a court order resting upon the application.

There is little question that §§ 2518 (1)(a) and (4)(d) were intended to make clear who bore the responsibility for approval of the submission of a particular wiretap

application. Thus, the Senate Report accompanying the favorable recommendation of Title III states that § 2518 (1)(a) "requires the identity of the person who makes, and the person who authorized the application[,] to be set out. . This fixes responsibility." S. Rep. No. 1097, 90th Cong., 2d Sess., 101 (1968). And § 2518 (4)(d) "requires that the order note the agency authorized to make the interception and the person who authorized the application so that responsibility will be fixed." *Id.*, at 103. Where it is established that responsibility for approval of the application is fixed in the Attorney General, however, compliance with the screening requirements of Title III is assured, and there is no justification for suppression.

Respondents suggest that the misidentification of Assistant Attorney General Wilson as the authorizing official was calculated to mislead the District Judge in considering the wire interception applications, and certainly had the effect of misleading him, since the interception order also misidentified the authorizing official in reliance on the statements made in the application. We do not perceive any purpose to be served by deliberate misrepresentation by the Government in these circumstances. To the contrary, we think it cannot be seriously contended that had the Attorney General been identified as the person authorizing the application, rather than his subordinate, Assistant Attorney General Wilson, the District Judge would have had any greater hesitation in issuing the interception order. The same could not be said, of course, if, as in *Giordano*, the correct information had revealed that none of the individuals in whom Congress reposed the responsibility for authorizing interception applications had satisfied this preliminary step. The District Court undoubtedly thought that Wilson had approved the Chavez and Fernandez wiretap applications, and we do not condone the Justice

Department's failure to comply in full with the reporting procedures Congress has established to assure that its more substantive safeguards are followed.[4]  But we cannot say that misidentification was in any sense the omission of a requirement that must be satisfied if wiretapping or electronic surveillance is to be lawful under Title III.

Neither the District Court nor the Court of Appeals made clear which of the grounds set forth in § 2518 (10)(a) was relied upon to suppress the Chavez wiretap evidence.  Respondents rely on each of the first two grounds, *i. e.,* that the communications were "unlawfully intercepted" and that the Chavez interception order is "insufficient on its face."  Support for the latter claim is drawn from the District Court decision in *United States* v. *Focarile,* 340 F. Supp. 1033, 1057–1060 (Md.), aff'd on other grounds *sub nom. United States* v. *Giordano,* 469 F. 2d 522 (CA4 1972), aff'd, *ante,* p. 505, which concluded that an order incorrectly identifying who authorized the application is equivalent to an order failing to identify anyone at all as the authorizing official.  We find neither of these contentions persuasive.

Here, the interception order clearly identified "on its face" Assistant Attorney General Wilson as the person who authorized the application to be made.  Under § 2516 (1), he properly could give such approval had he been specially designated to do so by the Attorney Gen-

---

[4] The Government advises that in the spring of 1972 it revised the form memoranda by which the Attorney General had approved applications for wiretapping or electronic surveillance authority, and the form language in the letters sent to the applying attorneys, which are appended to the applications filed in the district courts, to accurately reflect that approval was obtained from the Attorney General, rather than a specially designated Assistant, unless the latter happens to be the case.  Brief for United States in *United States* v. *Giordano* 9.

eral, as the order recited. That this has subsequently been shown to be incorrect does not detract from the facial sufficiency of the order.[5] Moreover, even if we were to look behind the order despite the clear "on its face" language of § 2518 (10)(a)(ii), it appears that the Attorney General authorized the application, as he also had the power to do under § 2516 (1). In no realistic sense, therefore, can it be said that the order failed to identify an authorizing official who possessed statutory power to approve the making of the application. The claim that communications to and from the Chavez phone were "unlawfully intercepted" is more plausible, but does not persuade us, given the purposes to be served by the identification requirements and their place in the statutory scheme of regulation. Though we rejected, in *Giordano*, the Government's claim that Congress intended "unlawfully intercepted" communications to mean only those intercepted in violation of constitutional requirements, we did not go so far as to suggest that every failure to comply fully with any

---

[5] Respondents' attempt to analogize the facial insufficiency of a search warrant supported by an affidavit submitted under a false name, a deficiency which has been held by some courts to require suppression under Fed. Rule Crim. Proc. 41, *King* v. *United States*, 282 F. 2d 398 (CA4 1960), or under the Fourth Amendment, *United States ex rel. Pugh* v. *Pate*, 401 F. 2d 6 (CA7 1968), cert. denied, 394 U. S. 999 (1969), to the asserted facial insufficiency of a wire interception order which incorrectly identifies who authorized the application for the order, must fail. Without passing on the soundness of these cases, it must be recalled that the misidentification of the officer authorizing a wiretap application is irrelevant to the issue of probable cause, which is supported by the separate affidavits of investigative officials. See 18 U. S. C. §§ 2518 (1) and (3). Moreover, no basis is provided in Title III for challenging the validity of the interception order depending on whether the application was approved by the Attorney General rather than a specially designated Assistant.

requirement provided in Title III would render the interception of wire or oral communications "unlawful." To establish such a rule would be at odds with the statute itself. Under § 2515, suppression is not mandated for every violation of Title III, but only if "disclosure" of the contents of intercepted communications, or derivative evidence, would be in violation of Title III. Moreover, as we suggested in *Giordano,* it is apparent from the scheme of the section that paragraph (i) was not intended to reach every failure to follow statutory procedures, else paragraphs (ii) and (iii) would be drained of meaning. *Giordano* holds that paragraph (i) does include any "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Ante,* at 527.

In the present case, the misidentification of the officer authorizing the wiretap application did not affect the fulfillment of any of the reviewing or approval functions required by Congress and is not within the reach of paragraphs (ii) and (iii). Requiring identification of the authorizing official in the application facilitates the court's ability to conclude that the application has been properly approved under § 2516; requiring identification in the court's order also serves to "fix responsibility" for the source of preliminary approval. This information contained in the application and order further aids the judge in making reports required under 18 U. S. C. § 2519.[6] That section requires the judge

---

[6] Section 2519 provides in full:

"§ 2519. Reports concerning intercepted wire or oral communications.

"(1) Within thirty days after the expiration of an order (or each extension thereof) entered under section 2518, or the denial of an

who issues or denies an interception order to report his action and certain information about the application, including the "identity of . . . the person authorizing the

order approving an interception, the issuing or denying judge shall report to the Administrative Office of the United States Courts—

"(a) the fact that an order or extension was applied for;

"(b) the kind of order or extension applied for;

"(c) the fact that the order or extension was granted as applied for, was modified, or was denied;

"(d) the period of interceptions authorized by the order, and the number and duration of any extensions of the order;

"(e) the offense specified in the order or application, or extension of an order;

"(f) the identity of the applying investigative or law enforcement officer and agency making the application and the person authorizing the application; and

"(g) the nature of the facilities from which or the place where communications were to be intercepted.

"(2) In January of each year the Attorney General, an Assistant Attorney General specially designated by the Attorney General, or the principal prosecuting attorney of a State, or the principal prosecuting attorney for any political subdivision of a State, shall report to the Administrative Office of the United States Courts—

"(a) the information required by paragraphs (a) through (g) of subsection (1) of this section with respect to each application for an order or extension made during the preceding calendar year;

"(b) a general description of the interceptions made under such order or extension, including (i) the approximate nature and frequency of incriminating communications intercepted, (ii) the approximate nature and frequency of other communications intercepted, (iii) the approximate number of persons whose communications were intercepted, and (iv) the approximate nature, amount, and cost of the manpower and other resources used in the interceptions;

"(c) the number of arrests resulting from interceptions made under such order or extension, and the offenses for which arrests were made;

"(d) the number of trials resulting from such interceptions;

"(e) the number of motions to suppress made with respect to such interceptions, and the number granted or denied;

"(f) the number of convictions resulting from such interceptions

application," within 30 days, to the Administrative Office of the United States Courts, § 2519 (1)(f). An annual report of the authorizing officials designated in § 2516 must also be filed with that body, and is to contain the same information with respect to each application made as is required of the issuing or denying judge, § 2519 (2)(a). Finally, a summary of the information filed by the judges acting on applications and the prosecutors approving their submission is to be filed with Congress in April of each year by the Administrative Office, § 2519 (3). The purpose of these reports is "to form the basis for a public evaluation" of the operation of Title III and to "assure the community that the system of court-order[ed] electronic surveillance . . . is properly administered . . . ." S. Rep. No. 1097, 90th Cong., 2d Sess., 107. While adherence to the identification reporting requirements of §§ 2518 (1)(a) and (4)(d) thus can simplify the assurance that those whom Title III makes responsible for determining when and how wiretapping and electronic surveillance should be

---

and the offenses for which the convictions were obtained and a general assessment of the importance of the interceptions; and

"(g) the information required by paragraphs (b) through (f) of this subsection with respect to orders or extensions obtained in a preceding calendar year.

"(3) In April of each year the Director of the Administrative Office of the United States Courts shall transmit to the Congress a full and complete report concerning the number of applications for orders authorizing or approving the interception of wire or oral communications and the number of orders and extensions granted or denied during the preceding calendar year. Such reports shall include a summary and analysis of the data required to be filed with the Administrative Office by subsections (1) and (2) of this section. The Director of the Administrative Office of the United States Courts is authorized to issue binding regulations dealing with the content and form of the reports required to be filed by subsections (1) and (2) of this section."

conducted have fulfilled their roles in each case, it does not establish a substantive role to be played in the regulatory system.

Nor is there any legislative history concerning these sections, as there is, for example, concerning § 2516 (1), see *United States* v. *Giordano, ante,* at 516 *et seq.,* to suggest that they were meant, by themselves, to occupy a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance. Though legislation to regulate the interception of wire and oral communications had been considered by Congress earlier, the proposed statute drafted for the President's Commission on Law Enforcement and Administration of Justice appears to have been the first published proposal to contain a requirement that the application for interception authority should specify "who authorized the application." Task Force Report: Organized Crime, App. C, p. 109, § 3803 (a)(1) (1967). That proposed bill, which was substantially followed in Title III, also provided for reports like those now required by 18 U. S. C. § 2519, including information on "the identity of . . . who authorized the application." *Id.,* at 111, §§ 3804 (a)(6) and (b)(1). It did not, however, require the order to contain this information. *Id.,* at 110, § 3803 (e). S. 675, a bill introduced by Senator McClellan on January 25, 1967, as the "Federal Wire Interception Act," 113 Cong. Rec. 1491, did not contain any of these identification requirements. Hearings on Controlling Crime Through More Effective Law Enforcement before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 77–78, §§ 8 (a), (d), 9 (a) (1967). S. 2050, however, a proposal by Senator Hruska to regulate both wiretapping and electronic surveillance, did. Section 2518 (a)(1) required an interception application

to include "the identity of the person who authorized the application," and §§ 2519 (a)(6) and (b)(1) provided that judges and authorizing prosecutors report "the identity of . . . who authorized the application," but did not require that the order contain this information, § 2518 (e). Hearings, *supra*, at 1006–1008. The requirement that this information be contained in the order, as well as in the application and required reports, first appeared in § 2518 (e)(4) of H. R. 13482, 90th Cong., 2d Sess. (1967). Though the House never reported out of committee any wiretapping bill, it was retained in S. 917, a combination of S. 675 and S. 2050, whose provisions ultimately were enacted as Title III. Despite the appearance and modification of the identification requirements during the legislative process, however, no real debate surrounded their adoption, and only the statements in S. Rep. No. 1097, *supra*, that they were designed to fix responsibility, give any indication of their purpose in the overall scheme of Title III. No role more significant than a reporting function designed to establish on paper that one of the major procedural protections of Title III had been properly accomplished is apparent.

When it is clearly established, therefore, that authorization of submission of a wiretap or electronic surveillance application has been given by the Attorney General himself, but the application, and, as a result, the interception order, incorrectly state that approval has instead been given by a specially designated Assistant Attorney General, the misidentification, by itself, will not render interceptions conducted under the order "unlawful" within the meaning of § 2518 (10)(a)(i) or the disclosure of the contents of intercepted communications, or derivative evidence, otherwise "in violation of" Title III within the meaning of § 2515. Hence, the suppression of the Chavez wiretap evidence on the basis

of the misidentification of Assistant Attorney General Wilson as the authorizing official was in error. Though we deem this result to be the correct one under the suppression provisions of Title III, we also deem it appropriate to suggest that strict adherence by the Government to the provisions of Title III would nonetheless be more in keeping with the responsibilities Congress has imposed upon it when authority to engage in wiretapping or electronic surveillance is sought.

The judgment of the Court of Appeals is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.      *It is so ordered.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN, MR. JUSTICE STEWART, and MR. JUSTICE MARSHALL join, concurring in part and dissenting in part in No. 72–1319, *United States* v. *Chavez,* and concurring in No. 72–1057, *United States* v. *Giordano, ante,* p. 505.

. The Court deals with two different Justice Department violations of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which imposes express limitations on the use of electronic surveillance. In *United States* v. *Giordano* the Court correctly finds that the violation of 18 U. S. C. § 2516 (1) is a violation of a statutory requirement which "directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." The Court also properly finds that a violation of such a statutory requirement mandates suppression of the evidence seized by the unlawful interception. I join the opinion of the Court in *Giordano.* The same violation of § 2516 (1) is also involved in the Fernandez wiretap in *United States* v. *Chavez,* and I therefore concur in the Court's suppression of the

evidence seized in that wiretap. In *Chavez,* however, the Court finds that suppression is not warranted for the violations of 18 U. S. C. §§ 2518 (1)(a) and 2518 (4)(d) which the Court admits occurred in the Chavez wiretap itself. I dissent from this conclusion, hereinafter referred to as the holding of *Chavez.*

## I

Title III permits electronic surveillance to be employed only pursuant to a court order. It requires *inter alia,* that a federal trial attorney desiring to apply to the District Court for such a wiretap order must first secure, authorization from one of a group of specified officials in the Justice Department. *Giordano* represents a class of cases in which authorization for electronic surveillance was given by Sol Lindenbaum, the Executive Assistant to Attorney General John Mitchell, in violation of the "authorization - requirement" of § 2516 (1) of Title III. This section provides that a wiretap order may be applied for only after authorization by "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General." *Chavez,* on the other hand, represents a class of cases where the Justice Department violated the "identification requirement" of § 2518 (1)(a) of Title III, which requires that each application made to the District Court for a wiretap order "shall include . . . the identity of . . . the officer authorizing the application." Because the District Courts in this class of cases were supplied with misinformation as to the identity of the person who authorized the applications made to them, the orders they entered approving the use of electronic surveillance violated § 2518 (4)(d) of Title III, which provides that *such orders "shall specify . . . the identity*

*of . . . the person authorizing the. application."* (Emphasis added.)

In the Justice Department between 1969 and 1972, a request from a federal trial attorney for authorization to apply for a wiretap order was reviewed in the Criminal Division before being sent to Attorney General Mitchell. According to the Solicitor General, in *Chavez* Attorney General Mitchell made the operative decision to authorize the wiretap application and signified this by sending a memorandum to Assistant Attorney General Will Wilson directing Wilson to authorize the trial attorney to submit the application to the District Court. The memorandum,[1] the Solicitor General admits, does not make clear that the operative decision was made in the Attorney General's Office; rather, it indicates that Wilson himself was designated to review and authorize the application.

At this point, a letter of authorization was sent to the trial attorney, which clearly identified Assistant Attorney General Wilson, and not Mitchell, as the person who had made the operative decision to authorize the wiretap.[2] Wilson, however, neither saw nor authorized

---

[1] The form memorandum employed by Mitchell stated in part:

"This is with regard to your recommendation that authorization be given to [the particular trial attorney] to make application for an Order of the Court under Title 18, United States Code, Section 2518, permitting the interception of wire communications for a [particular] period to and from telephone number [the listed telephone numbers of the particular criminal investigation] . . . ."

"Pursuant to the powers conferred on me by Section 2516 of Title 18, United States Code, *you are hereby specially designated to exercise those powers for the purpose of authorizing* [the particular trial attorney] to make the above-described application." (Emphasis added.)

[2] The letter sent over Wilson's signature in *Chavez* read:

"This is with regard to your request for authorization to make application pursuant to the provisions of Section 2518 of Title 18,

the Chavez wiretap application or any others; his signature was affixed to the authorization letters by a Deputy Assistant Attorney General, either Harold P. Shapiro or Henry E. Petersen.[3]

When the trial attorney applied for a wiretap order in the District Court, he attached the letter of authorization purportedly signed by Wilson, and naturally misidentified Wilson as the person who had authorized the application to be made,[4] in violation of the identification

---

United States Code, for an Order of the Court authorizing the Bureau of Narcotics and Dangerous Drugs and the Bureau of Customs [to intercept wire communications at the particular number involved] . . . .

"*I have reviewed your request and the facts and circumstances detailed therein, and have determined that there exists probable cause to believe* that [named individuals were committing certain offenses] . . . . *I have further determined* that there exists probable cause to believe that the above persons make use of the described facility in connection with those offenses, that wire communications concerning the offenses will be intercepted, and that normal investigative procedures reasonably appear to be unlikely to succeed if tried.

"Accordingly, *you are hereby authorized under the power specially delegated to me* in this proceeding by the Attorney General of the United States, the Honorable John N. Mitchell, pursuant to the power conferred on him by Section 2516 of Title 18, United States Code, to make application to a judge of competent jurisdiction for an Order of the Court pursuant to Section 2518 of Title 18, United States Code [to intercept the described wire communications] . . . ." (Emphasis added.)

[3] In *Chavez,* the letter was signed by Petersen.

[4] The application stated:

"[T]he Honorable John N. Mitchell, has specially designated in the proceeding the Assistant Attorney General for the Criminal Division of the United States Department of Justice, The Honorable Will Wilson, to authorize affiant to make this application for an Order authorizing the interception of wire communications. This letter of authorization signed by the Assistant Attorney General is attached to this application as Exhibit A."

requirement of § 2518 (1)(a). As a result, the District Court's order identified Wilson, and not Mitchell, as the Justice Department official who had authorized the trial attorney to apply for the Chavez wiretap order,[5] in violation of the identification requirement of § 2518 (4)(d).

In *Chavez*, Mitchell first acknowledged responsibility for authorizing the wiretap application in an affidavit filed with the District Court only after respondents had made a motion to suppress the evidence in the tap. Similar affidavits stating that Mitchell had authorized the application, rather than Wilson, were filed by Lindenbaum and Petersen. The courts below, on the strength of these affidavits, have held that Mitchell did in fact authorize the application to be made. Both, however, ordered the evidence which was seized by the surveillance to be suppressed, since the application misidentified Wilson as the responsible official. This Court reverses the Court of Appeals.

## II

Deciding a question not reached in *Giordano*, the Court in *Chavez* holds that suppression is not dictated when there has been a violation of a provision of Title III which does not, in the view of the courts, "directly and substantially implement the congressional intention to limit the use of intercept procedures" to cases clearly calling for electronic surveillance. I cannot agree that Title III, fairly read, authorizes the courts to pick and choose among various statutory provisions, suppressing

---

[5] The order read in part:

"Special Agents . . . are authorized, pursuant to the application authorized by the Assistant Attorney General for the Criminal Division of the United States Department of Justice, the Honorable Will Wilson, [to intercept wire communications] . . . ."

evidence only when they determine that a provision is "substantive," "central," or "directly and substantially" related to the congressional scheme.

Section 2515 of Title III unambiguously provides that no evidence derived from any intercepted communication may be received "in any trial . . . in or before any court . . . if the disclosure of that information would be in violation of this chapter." The Court acknowledges this provision in *Chavez, ante,* at 575, but disregards two sections of Title III explicitly dealing with disclosure in determining when disclosure is in fact "in violation of" Title III. Section 2511 (1), which provides criminal penalties for willful violations of Title III, prohibits in § 2511 (1)(c) knowing disclosure of communications intercepted in violation of subsection (1), and the subsection prohibits interception "[e]xcept as otherwise specifically provided in this chapter." § 2511 (1)(a). Section 2517 (3) authorizes the disclosure in a criminal proceeding of information received "by any means authorized by this chapter" or of evidence derived from a communication "intercepted in accordance with the provisions of this chapter." The statute does not distinguish between the various provisions of the Title, and it seems evident that disclosure is "in violation of" Title III when there has not been compliance with any of its requirements.

The Court fixes on § 2518 (10)(a), which defines the class of persons who may move to suppress the admission of evidence. This section provides that any aggrieved person may move to suppress evidence on the grounds that

"(i) the communication was unlawfully intercepted;

"(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

"(iii) the interception was not made in conformity with the order of authorization or approval."

Since paragraphs (ii) and (iii) reach some statutory violations, reasons the Court, paragraph (i) cannot reach all statutory violations or else paragraphs (ii) and (iii) would be "drained of all meaning."

The choice seems to be between attributing to Congress a degree of excessive cautiousness which led to some redundancy in drafting the protective provisions of § 2518 (10)(a), or foolishness which led Congress to enact statutory provisions for law enforcement officials to scurry about satisfying when it did not consider the provisions significant enough to enforce by suppression. In view of the express prohibition by §2515 of disclosure of information "in violation of" the chapter, I would opt for the conclusion that Congress was excessively cautious, and that "unlawfully intercepted" means what it says.

Congress could easily have given the judiciary discretion to apply the suppression remedy only for violations of "central" statutory provisions by using language such as "unlawfully intercepted in violation of important requirements of this chapter" in § 2518 (10)(a). But no such limitation appears. Further, the legislative history of Title III emphasizes Congress' intent to enforce every provision of the Title with the remedy provided in §§ 2515 and 2518 (10)(a). The Senate Report which accompanied Title III to the Congress states that "Section 2515 . . . imposes an evidentiary sanction to compel compliance with the other prohibitions of the chapter," and that § 2518 (10)(a) together with § 2515 "applies to suppress evidence directly . . . or indirectly obtained in violation of the chapter." S. Rep. No. 1097, 90th Cong., 2d Sess., 96 (1968).

Again, no distinction supports the conclusion that Congress considered any provision of Title III more

important than any other in the applications of the suppression remedy. Congress at no point indicated that it intended to give the courts the discretion to distinguish various provisions of Title III, never suppressing evidence for violations of some—such as §§ 2518 (1)(a) and (4)(d)—deemed not "directly and substantially" related to the congressional intent to limit the use of electronic surveillance. No matter how egregious or willful the violation of these provisions, it seems that suppression will not follow, and the Court opens the door to the creation of other non-"central" statutory requirements. This breadth of discretion is not part of the congressional scheme, and the Court oversteps its judicial role when it arrogates such discretion to itself.

### III

Moreover, even under the test the Court defines in *Chavez*, that violations of only those statutory provisions "directly and substantially" limiting the use of electronic surveillance will warrant suppression, the violation of the identification requirements of §§ 2518 (1)(a) and (4)(d) mandates suppression in *Chavez*. For the requirement of § 2518 (1)(a) that the application for a wiretap "shall include . . . the identity of . . . the officer authorizing the application" together with that of § 2518 (4)(d) that the wiretap order contain the same information significantly implements the congressional intention to limit the use of electronic surveillance procedures.

In support of its conclusion that suppression is not mandated by the §§ 2518 (1)(a) and 2518 (4)(d) violations in *Chavez*, the Court states that while Congress expressed the intent that these provisions "fix responsibility" on the person who authorized the employment of electronic surveillance, "[w]here it is established that responsibility for approval of the application is fixed

in the Attorney General, however, compliance with the screening requirements of Title III [§ 2516] is assured, and there is no justification for suppression." *Ante,* at 572. To the Court, the provisions "[do] not establish a substantive role to be played in the regulatory system. . . . No role more significant than a reporting function designed to establish on paper that one of the major procedural protections of Title III [the authorization requirement of § 2516] had been properly accomplished is apparent." *Ante,* at 578, 579.

The Court reduces the statement of Congress that the identification provisions were created to "fix responsibility" for a wiretap authorization to meaning only that the provisions were drafted to assure the courts that there had been compliance with the authorization requirement of § 2516. And the Court finds it satisfactory that this responsibility is established by an *ex post facto* affidavit of the Attorney General, stating that he in fact authorized the Chavez surveillance.

It seems to me a complete misreading of Congress' attempt to "fix responsibility" in the application and order to reach these conclusions. Sections 2518 (1)(a) and 2518 (4)(d) are not part of the detailed and stringent guidelines of Title III through legislative inadvertence. They were not present in early proposals to regulate wiretapping, but were carefully inserted in later proposals, culminating in the draft which became Title III. A 1961 proposal to allow wiretapping under regulated conditions did not contain any identification requirement, although it contained provisions designating those who could authorize surveillance.[6] S. 675, introduced in the 90th Con-

---

[6] S. 1495, 87th Cong., 1st Sess., § 4 (b), printed in Hearings on Wiretapping and Eavesdropping Legislation before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 87th Cong., 1st Sess., 4, 5 (1961).

gress by Senator McClellan on January 25, 1967, 113
Cong. Rec. 1491, did not require either the application
or the court order to identify the person who authorized
the surveillance application.[7]  S. 2050, introduced five
months later by Senator Hruska, 113 Cong. Rec. 18007,
expressly required that the application to the court set
forth "the identity of the person who authorized the
application," but did not require the court order to con-
tain this information.[8]  H. R. 13482, introduced in the
House on October 12, 1967, 113 Cong. Rec. 28792, not only
required that the application identify the person author-
izing it, but also that the court order contain this infor-
mation.  Six months later, on April 29, 1968, the Senate
Judiciary Committee reported S. 917, whose provisions
ultimately were enacted as Title III, accompanying the
bill with an extended explanation of every provision.[9]
Though it noted that Title III is "essentially a combi-
nation" of S. 675 and S. 2050,[10] the Judiciary Committee
went beyond either of those bills as to the identifica-
tion requirements, mandating that both the application
and the order identify the person who authorized the
application.

In its discussion of the authorization requirement of
§ 2516, the Senate Report states:

> "This provision centralizes in a publicly responsible
> official subject to the political process the formula-
> tion of law enforcement policy on the use of elec-
> tronic surveillance techniques.  Centralization will

---

[7] Printed in Hearings on Controlling Crime Through More Effec-
tive Law Enforcement before the Subcommittee on Criminal Laws
and Procedures of the Senate Committee on the Judiciary, 90th
Cong., 1st Sess., 75 (1967).

[8] Printed in Hearings, *supra*, n. 7, at 1006.

[9] S. Rep. No. 1097, 90th Cong., 2d Sess. (1968).

[10] *Id.*, at 66.

avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen." S. Rep. No. 1097, 90th Cong., 2d Sess., 97 (1968).

But this alone was not sufficient. The Report continues:

"The application must be made to a Federal judge of competent jurisdiction, as defined in section 2510 (9), discussed above. *The application must conform to section 2518, discussed below." Ibid.* (Emphasis added.)

The Committee's discussion of § 2518 states:

"Section 2518 of the new chapter sets out in detail the procedure to be followed in the interception of wire or oral communications.

"Subparagraph [2518 (1)(a)] *requires* the identity of the person who makes, and the person who authorized the application to be set out. *This fixes responsibility.*

"Subparagraph [2518 (4)(d)] requires that the order note the agency authorized to make the interception and the person who authorized the application *so that responsibility will be fixed." Id.,* at 100, 101, 103. (Emphasis added.)

The crucial concept is Congress' expression of intention that §§ 2518 (1)(a) and (4)(d) should be complied with, so that the application and order would fix responsibility.

Clearly, no such responsibility was fixed on Mitchell,

the authorizing official, in *Chavez.* As the Court of Appeals noted, 478 F. 2d 512, 515, 516, there

> "was a misrepresentation, in circumstantial and carefully phrased detail, all pointing to Wilson as the officer authorizing the application, when in fact he did no such thing.
>
> ". . . The Wilson letter and the Mitchell memorandum . . . create the illusion of compliance with the Act. Without Mitchell's affidavit, the lines of responsibility lead to Wilson, not to Mitchell."

Yet Wilson never saw the application for which Mitchell now accepts responsibility. Before the affidavits submitted to the District Court in response to the motion to suppress, about one year after the application was initially authorized, responsibility pointed directly at Wilson, and no document implicated Mitchell.

It is simply not enough that Mitchell's responsibility is established only after a prosecution is under way and a motion to suppress filed. After-the-fact acceptance for the Chavez surveillance was made at no cost. The surveillance was productive and was directed against an alleged drug trafficker, a pariah of society. Accepting responsibility at this point, further, helped Mitchell and the Justice Department avoid the acute embarrassment of losing this prosecution. But this was not the scheme created by the Congress. By creating the identification provisions, which required the authorizing official to be made known at the time of an application, it established a mechanism by which a person's responsibility was to be acknowledged immediately, not a device by which the identity of the person authorizing the application would remain hidden until it was discovered that an instance of electronic surveillance had been productive and not offensive to public sensibilities.

592

Immediate acknowledgment of responsibility for authorizing electronic surveillance is not an idle gesture. It lessens or eliminates the ability of officials to later disavow their responsibility for surveillance. By adding the identification provisions of § 2518, Congress took a step toward stripping from responsible officials the ability to choose after the fact whether to accept or deny that responsibility by coming forward and filing an affidavit. "Fixing" of responsibility in the application and order can have no other meaning; it simply does not comprehend a situation where responsibility is concealed or unsettled. Had Congress been content with compliance with § 2516 being proved and responsibility for surveillance being established by later testimony and affidavits, it could easily have left the legislation in its early form without adding the express requirements of §§ 2518 (1)(a) and (4)(d) to the Act.[11]

The Court's treatment of the identification requirements trivializes Congress' efforts in adding them to Title III. In *Giordano*, the Court relies on Congress' clearly expressed desire that an official, responsible to the political process, should make the decision authorizing electronic surveillance and bear the scrutiny of Congress and the public for that decision. As noted, the Senate Report which accompanied Title III to Congress stated that § 2516 "centralizes in a publicly responsible official subject to the political process" the formulation of electronic surveillance policy so that "[s]hould abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guar-

---

[11] The Court in *Chavez* finds some guidance in the fact that "no real debate surrounded" the adoption of the identification requirements. This is not surprising, in that the provisions were added to wiretapping legislation in committee, and justified in the Judiciary Committee's report.

anteeing that no abuses will happen." S. Rep. No. 1097, 90th Cong., 2d Sess., 97 (1968). Similarly, Senator Long, in support of the bill, read from a report which stated: "We agree that responsibility should be focused on those public officials who will be principally accountable to the courts and the public for their actions."[12] Speaking to a related provision requiring that politically responsible state prosecuting officials authorize state applications, Professor Blakey of Notre Dame, instrumental in the drafting of Title III, stated:

"Now, the reason [for this requirement] is that unless we involve someone in the process of using this equipment who is politically responsible, that is, someone who must return to the people periodically and be reelected, it seems to me we miss a significant check on possible abuse. As a practical matter, if there is police abuse, the remedies that we can take against them are limited. If we involve the responsible judgment of a political official in the use of this equipment, and it is then abused, the people have a very quick and effective remedy at the next election."[13]

But it is clear that this personal responsibility and political accountability, relied on by Congress to check the reckless use of electronic surveillance, is rendered a mere chimera when the official actually authorizing a wiretap application is not identified until years after the

[12] 114 Cong. Rec. 14474. The Report was by the Association of the Bar of the City of New York, Committee on Federal Legislation, Committee on Civil Rights, entitled "Proposed Legislation on Wiretapping and Eavesdropping after *Berger* v. *New York* and *Katz* v. *United States.*"

[13] Hearings on Anti-Crime Program before Subcommittee No. 5 of the House Committee on the Judiciary, 90th Cong., 1st Sess., 1380 (1967).

tap has occurred, when he might already be out of office, when the usefulness of the tap is already established, when it is clear that the surveillance was not abusive, and then only through voluntary admissions or the sifting of potentially contradictory affidavits. Responsibility is hardly "focused," and the "lines of responsibility" are gossamer at best. This is why Congress added the demand that responsibility be immediately *fixed*. The procedures which the Court sanctions in *Chavez* stretch the unequivocally expressed desire of Congress to *fix responsibility* in the application and order well beyond the breaking point.

In eviscerating Congress' intent to fix responsibility in the application and order, the Court destroys a significant deterrent to reckless or needless electronic surveillance. It allows the official authorizing a wiretap to remain out of the harsh light of public scrutiny at the crucial beginning of the wiretap process, only to emerge later when he chooses to identify himself. Knowledge that personal responsibility would be immediately focused and immutably fixed, whatever the outcome of surveillance, be it profitable or profligate, successful or embarrassing, forces an official to be circumspect in initially authorizing an electronic invasion of privacy. This is why Title III requires more than a judicial determination of probable cause; it also requires an accountable political official to exercise political judgment, and it requires that the political official be immediately identified and his responsibility fixed when an application is filed. The identification procedures, by fixing responsibility, obviously serve to "limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device," thereby requiring suppression even under the test the Court adopts in *Chavez*.

## IV

The Court mentions in passing the reporting requirements of Title III, noting the information furnished the judge pursuant to § 2518 (1)(a) is useful in making the reports required of him under § 2519. This section requires the judge to report, *inter alia,* the name of the party who authorized each wiretap application made to him to the Administrative Office of the United States Courts within 30 days after surveillance has been completed. § 2519 (1)(f). At the same time, § 2519 (2) requires the authorizing prosecuting officials designated in § 2516 to file a report in January of each year, which also must include the name of the person who authorized applications made during the previous calendar year. In reliance on this information, the Administrative Office is to report such information to the Congress for public scrutiny. § 2519 (3). Like the applications and wiretap orders themselves, this report is to include the names of those persons responsible for authorizing electronic surveillance.

In the set of cases represented by *Chavez,* of course, the person actually authorizing the applications, Mitchell, was not made known to the courts which approved them, and so the reports filed with the Administrative Office by the judiciary did not identify him as the responsible official. The potential for public accountability through this channel was foreclosed by the misinformation given the courts. While the report filed by the office of the Attorney General in January 1970 did state that the 1969 applications filed in Wilson's name had been personally approved by Mitchell, the Solicitor General informs us that the reports filed by the Attorney General regarding instances of electronic surveillance for 1970 and after, including the Giordano wiretap (1970) and the Chavez tap (1971), did not acknowledge that

Mitchell had personally authorized the surveillance attributed to his subordinates.[14] The failure of the Attorney General's office to document the actual personal responsibility of Mitchell for surveillance authorizations occurred as those authorizations proliferated: there were only 34 instances of federal surveillance reported under Title III for 1969, but that number rose to 183 in 1970 and 238 in 1971.[15] *Ex post facto* acknowledgment of responsibility by Mitchell in the annual reports filed pursuant to § 2519 (2) could not, of course, cure the violation of the express congressional mandate of § 2518 (1)(a), any more than did Mitchell's filing of an affidavit. Nevertheless, not even these reports for years after 1969 provided documentation that Mitchell was the Justice Department official actually responsible for authorizing electronic surveillance. While Congress demanded the openness of political accountability, Justice Department documents drew a veil of secrecy, and no personal responsibility was attributed in any documents to Mitchell, the person actually responsible for authorizing the electronic surveillance.

## V

As the Court recognized in *Gelbard* v. *United States,* 408 U. S. 41, 48, the protection of privacy was an overriding concern of Congress when it established the requirements of Title III in 1968:

> "The need for comprehensive, fair and effective reform setting uniform standards is obvious. New

---

[14] The Administrative Office, nonetheless, repeated the statement made for 1969 that Mitchell had "personally" authorized the applications.

[15] See Administrative Office of United States Courts, Reports on Applications for Orders Authorizing or Approving the Interception of Wire or Oral Communications, 1969, 1970, 1971.

protections for privacy must be enacted." S. Rep. No. 1097, 90th Cong., 2d Sess., 69.

Electronic surveillance was a serious political issue, and these detailed and comprehensive requirements are not portions of a hastily conceived piece of legislation. As noted above, electronic surveillance legislation was introduced long before 1968, and the provisions of Title III are the culmination of a long evolutionary process. The Title was accompanied by an exhaustive and studied report in which the Senate Judiciary Committee offered an explanation and justification for each clause of the bill. I cannot believe that Congress perversely required law enforcement officials to jump through statutory hoops it considered unnecessary to the goal of protecting individual privacy from unwarranted electronic invasions.

On the contrary, the history of Title III reflects a desire that its provisions be strictly construed. Senator McClellan, sponsor of S. 675, one of the bases for Title III, and chairman of the committee which reported Title III to Congress, stated during hearings on his bill:

"I would not want any loose administration of this law.

"But [I would] have it very strictly observed. It is not to become a catchall for promiscuous use. I want to see this law strictly observed with the courts adhering to the spirit and intent of it in granting the orders.

"I think it ought to be tight, very definitely as free from loopholes as it can possibly be made . . . ." [16]

---

[16] Hearings on Controlling Crime Through More Effective Law Enforcement before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 90th Cong., 1st

Subsequently, McClellan's committee closed yet another loophole in the law by inserting the identification requirements of Title III, attempting thereby to fix responsibility at the time of the application for a wiretap order, requirements which this Court now nullifies.

Mr. Justice Holmes observed in dissent 70 years ago:

> "Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." *Northern Securities Co.* v. *United States,* 193 U. S. 197, 400–401.

---

Sess., 508, 869. In addition, in reporting to the Senate in 1969 on the operation of Title III during its first year, Senator McClellan stated:

"I do, however, want to admonish every law enforcement officer, prosecutor, and judge involved in this area that the only way this legislation will be effective in combating crime is by strict adherence to the standards it contains.

". . . This is an invaluable and powerful tool that must not be subjected to abuse. Those who violate the standards can and must either be punished and if they cannot learn to follow the law they must face loss of this law enforcement tool. . . .

"Mr. President, my purpose in making these remarks has been to help assure that this legislation will be, in fact, followed to the strictest letter of the law—both bringing criminals to book and protecting citizens' privacy. That is the only way in which it can be utilized as an effective tool in reducing crime. . . . Let us make sure that none of those who may be convicted can ask for a reversal because the law was not strictly followed." 115 Cong. Rec. 23241–23242.

The Solicitor General reminds us that substantial effort on the part of the Organized Crime Section of the Criminal Division of the Department of Justice is implicated, for the violations of Title III reflected in these two cases are not isolated occurrences. The failure of Attorney General Mitchell properly to authorize applications involves 60 cases and 626 defendants. The failure of surveillance applications to fix responsibility on Mitchell, when he did in fact authorize the applications, involves an additional 99 cases and 807 defendants. Yet the magnitude of the effect of suppression of unlawfully obtained evidence for these violations of Title III does not vitiate our duty to enforce the congressional scheme as written. The failure of a prosecution in a particular case pales in comparison with the duty of this Court to nourish and enhance respect for the evenhanded application of the law. I accordingly dissent in part in *Chavez.*