UNITED STATES of America, Appellee,

v.

Kathleen CITRO, a/k/a K.C.,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Steven ALONZO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Janice LODATO, a/k/a Janet Germana,
Defendant, Appellant.

Nos. 90–1203, 90–1238 and 90–1407.

United States Court of Appeals,
First Circuit.

July 17, 1991.

As Amended Aug. 6, 1991.

Rehearing and Rehearing En Banc
Denied Sept. 25, 1991.

Paul W. Hodes, by Appointment of the Court, with whom Roussos, Hage & Hodes, P.A., was on brief, Manchester, N.H., for defendant, appellant Kathleen Citro.

Gordon R. Blakeney, Jr., by Appointment of the Court, Concord, N.H., for defendant, appellant Steven Alonzo.

Jean–Claude Sakellarios, with whom Kathy Mulcahey–Hampson, and Sakellarios & Associates, were on brief, Manchester, N.H., for defendant, appellant Janice Lodato.

Deborah C. Sharp, Asst. U.S. Atty., with whom Jeffrey R. Howard, U.S. Atty., was on briefs, Concord, N.H., for U.S.

Before BREYER, Chief Judge, CAMPBELL, Circuit Judge, and CAFFREY,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

These appeals stem from a criminal prosecution in the district court initiated by a thirty-five count Indictment. The Indictment charged seventeen defendants, including the three appellants, with drug offenses in a conspiracy to distribute cocaine in the Manchester, New Hampshire area from 1987 to July 1989.

It was the government's position as the evidence tended to show, that the "kingpin" of the cocaine-trafficking conspiracy was Alton (also known as "Dan" or "Danny") Gray. Gray sold cocaine to individuals who had their own customer bases, and also employed others to cut, store and deliver cocaine and collect payments. Defendant-appellant Janice Lodato allegedly ran a stash house for Gray, cut cocaine for Gray, and bought cocaine from him for distribution to her own customers. Defendant-appellant Kathleen Citro was purportedly Gray's primary courier, making cocaine deliveries and collecting money from August 1987 through June 1988. Citro also operated her own distribution network, dealing in quarter and half grams of cocaine. Defendant-appellant Alonzo was Gray's primary courier for cocaine and money collection from November 1988 to May 1989.

All defendants, including defendants-appellants Lodato, Citro, and Alonzo, were charged in Count 1 of the Indictment with conspiracy to possess with intent to distribute in excess of thirty-five kilograms of cocaine in violation of 21 U.S.C. § 846. Lodato was charged in Count 27 with possession of cocaine with intent to distribute on May 5, 1989, in violation of 21 U.S.C. § 841(a)(1), and Citro was charged in Counts 4 and 5 with distribution of cocaine on November 17, 1988 and November 22, 1988, in violation of 21 U.S.C. § 841(a)(1).[1]

Lodato went to trial and was convicted as charged. On appeal, Lodato argues that the evidence was insufficient to support the guilty verdicts against her. She also argues that the district court erred in denying her motion to suppress evidence obtained through an allegedly illegal electronic "oral intercept"; and in refusing to admit into evidence a telephone answering machine taped message that allegedly would have impeached the government's lead witness. Finally, Lodato contests her sentence. She argues that the district

* Of the District of Massachusetts, sitting by designation.

1. Defendant-appellant Kurt Coriaty's motion to withdraw his appeal after briefing and oral argument was granted on April 23, 1991.

court erred in denying that it had discretion to depart downward from the sentencing guidelines to take into account her alleged cocaine dependency.

Citro's case was disposed of on a plea bargain. She pleaded guilty to a substituted single count Information charging her with the unlawful use of a communication facility to cause and facilitate the unlawful distribution of cocaine on or about November 22, 1988, (the "telephone count"), in violation of 21 U.S.C. § 843(b). In return, the government dismissed all indictment counts against Citro (Counts 1, 4 and 5). At sentencing, the district court granted Citro a two-point reduction for acceptance of responsibility but then departed upward from the guideline range of 6–12 months so as to take into account Citro's substantial participation in drug trafficking, sentencing her to 30 months imprisonment. On appeal, Citro argues that the district court erred, first, by declining to grant Citro a two-point reduction as a minor participant and, second, by departing upward from the guideline range on an improper basis.

Alonzo also pleaded guilty to an Information charging him with two counts of unlawful use of a communication facility (on or about February 27, 1989—and on or about March 1, 1989) to cause and facilitate the unlawful distribution of cocaine, in violation of 21 U.S.C. § 843(b). The government in return dismissed the only indictment count against Alonzo (Count 1). At sentencing, Alonzo's base offense level under the two telephone counts was determined to be 12. A two-point reduction was granted for acceptance of responsibility, and his criminal history resulted in a guideline imprisonment range of 10–16 months. Finding that the amount of cocaine involved warranted an upward departure and consecutive sentences, the district court sentenced Alonzo to forty-five months imprisonment on each count, for a total of ninety months. On appeal, Alonzo argues that the district court relied on improper grounds for departure in a telephone-count offense, such as the amount of drugs and the disparity between the charged offenses and those to which he pleaded, and that the district court erred in departing to impose consecutive sentences.

We deal in turn with each of appellants' major contentions.

### Janice Lodato
### Sufficiency of the Evidence

Lodato argues that the evidence was insufficient to prove conspiracy and possession with intent to distribute cocaine. As an admitted cocaine addict, she had no interest other than supporting her own habit, she says. She maintains that the one-half ounce of cocaine found in her purse at the time of her arrest was for personal use only, and that there was no evidence she possessed this or other cocaine for purposes of distribution. Lodato also argues that the evidence of overt acts in furtherance of the conspiracy count—storing cocaine in her apartment and cutting cocaine for Alton Gray—was insufficient to prove that she knowingly acted in furtherance of the conspiracy.

We believe that the evidence was plainly sufficient to support Lodato's convictions. Lodato was arrested at the Monterey Bay Chowder House, a restaurant owned by Gray in Manchester, New Hampshire. A DEA agent participating in the arrest testified that codefendant Alonzo was encountered in the front of the restaurant, and loudly "yelled": "Janice, the police are here" a number of times in an agitated manner. He testified that Lodato and Richard Hamblett were discovered in the back room, with drug paraphernalia in plain view on the counter. A pipe used for smoking crack cocaine, an Ohaus scale and an electric scale (used to weigh precise amounts of cocaine), plastic sandwich baggies (commonly used for retail sale of cocaine), and Inositol bottles were recovered from this area. (Inositol is commonly used to "cut," or dilute purity of cocaine for sale.) The agent testified that he found the Inositol bottles open and unsealed. A half ounce of cocaine and $994 in cash were recovered from Lodato's purse at the time of her arrest. Cocaine, Inositol, and an Ohaus scale were also recovered from Lodato's apartment soon after her arrest.

Gray testified that the day before the arrest Lodato had retrieved a scale and Inositol to cut and break down one kilogram of cocaine into ounces, which she did at the Monterey Bay Chowder House restaurant. Gray also testified that Lodato told him she needed four ounces for her customers that evening. Gray testified that, after Lodato was arrested at the restaurant and he was arrested at a local hotel, the two met the next day at the courthouse in Manchester at which time Lodato told Gray that just prior to her arrest she had put three ounces of cocaine under a trash bag in the office of the restaurant. Gray testified that, after her release on bail, Lodato arranged for him to purchase one kilogram of cocaine from a friend of Lodato's. He testified that he again purchased a half kilogram of cocaine through Lodato on one subsequent occasion at her home where they together broke down the cocaine into baggies.

Coconspirator Robert Bellotte, brother of Gray's lover, testified that, at least during the few months Bellotte was living in Gray's camper in 1989, Gray would take cocaine he purchased to Lodato's house. Bellotte testified that he saw Lodato weighing Gray's bulk cocaine. He testified that on this occasion Gray would add Inositol and cut the cocaine, and Lodato would weigh it and put it in plastic baggies. He testified that on this occasion Gray and Lodato packaged about 14 "eight-balls" (one-eighth ounce quantities of cocaine), and from eight to nine "sixteens" (one-sixteenth ounce quantities of cocaine), and that Gray gave a "good portion" of the packages to Lodato to bring home. Bellotte testified that a few days after this occasion, Lodato told him that she did not want to hold the cocaine for Gray any longer and, in addition, that she was selling cocaine. Finally, Bellotte testified that he brought a plastic bag from Gray to Lodato's apartment, and Gray testified that the bag contained drugs.

Edmund Romagnoli, a cocaine customer of Gray's, testified that he purchased cocaine on a daily basis in late 1988 and early 1989 at a True Value Hardware store owned by Gray. He testified that Lodato was present about half the time, either in front of the store or in Gray's office talking to Gray or cutting cocaine for him in the bathroom. Romagnoli estimated that he saw Lodato cutting cocaine approximately 15 times. He testified that Lodato would hand the cocaine package to Gray who would hand it to Romagnoli.

Gray testified extensively about his cocaine trafficking operation. He testified that in August 1988 he starting dealing in large kilogram quantities of cocaine, distributing ounces, half ounces and quarter ounces, totalling as much as one hundred kilograms of cocaine, the majority of which was dealt between August 1988 and May 1989. He testified that in about October 1988, after he hired Lodato to do wallpapering, Lodato asked to store the cocaine for him at her house because she was aware of Gray's difficulty with his lover using the cocaine stored at Gray's house. He testified that from that time through March 1989, Lodato "took care of the cocaine" for him, storing it and breaking it into quantities for distribution. Gray said he would send a courier to pick up what he needed for his customers from Lodato's home. He estimated that eight to ten ounces would be sold in a weekday, fifteen or sixteen ounces on weekend days. (Mondays were days off.) Gray also said Lodato cut the cocaine for him from October 1988 until March 1989. She did this either at her home or in the hardware store, using the bathroom off Gray's office. Gray estimated Lodato cut cocaine at the hardware store ten or fifteen times. He also recounted an incident in which a two kilogram delivery was made to his trailer home, and Lodato aided him in cutting the cocaine and placing it in quantities for distribution in plastic baggies.

Gray said Lodato was compensated $500 per kilo for storing the cocaine. In addition, Gray sold uncut cocaine to Lodato at a reduced price as compensation for her services. Gray testified that Lodato would buy approximately eight to ten ounces of cocaine per week from him for distribution to her own customers.

In sum, although Lodato took the stand at trial in her own defense and denied

stashing cocaine or cutting cocaine for Gray and denied selling cocaine, three witnesses testified to Lodato's direct involvement in the cocaine trafficking operation. From all of the testimony regarding Lodato's cutting and stashing cocaine discussed above, the jury could reasonably have found that Lodato committed at least one overt act in furtherance of the conspiracy. Further, Gray directly testified that he sold cocaine to Lodato who resold it to her own customers and Bellotte corroborated that Lodato admitted as much to him. The evidence was sufficient to warrant the jury's conclusion that Lodato was guilty beyond a reasonable doubt.

Motion to Suppress

The government applied for and received approval for an "oral intercept" that was placed in Gray's office at the True Value Hardware store. Lodato contends that the district court erred in failing to suppress evidence of the conspiracy obtained by use of this "oral intercept" because, she argues, the government failed to comply with the requirements of 18 U.S.C. § 2516(1) in obtaining authorization for the intercept. As we agree with the district court that the oral intercept was properly authorized, we do not reach the question of what evidence used against Lodato may have constituted forbidden "fruit" of the intercept under 18 U.S.C. § 2518(10)(a).[2]

18 U.S.C. § 2516(1) provides:

The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General in the Criminal Division specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for ... an order authorizing or approving the interception of wire or oral communications....

Lodato argues that § 2516(1) requires that individuals be designated specifically by name, and that designation by title is insufficient.

In this case, the "Authorization for Interception Order Application" was addressed to Frederick Hess, Director, Office Enforcement Operations, Criminal Division, from Edward S.G. Dennis, Jr., Assistant Attorney General, Criminal Division. The document carried Dennis's signature line, but was signed for Dennis by the stamped signature of John C. Keeney, Deputy Assistant Attorney General, Criminal Division. Assistant Attorney General Dennis and Deputy Assistant Attorney General Keeney were identified by title but not by name in the Attorney General's designation order.[3]

■ We think the Attorney General's Order No. 1162–86 adequately designated Assistant Attorney General Dennis and Deputy Assistant Attorney General Keeney for purposes of issuing the challenged interception order. Section 2516(1) does not state that the Attorney General must designate officials by name. Identification

---

**2.** Pursuant to 18 U.S.C. § 2518(10)(a),

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conjunction with the order of authorization or approval.

**3.** The Attorney General's Order No. 1162–86 (December 12, 1986) states: "I hereby specially designate the Assistant Attorney General in charge of the Criminal Division, any acting Assistant Attorney General in charge of the Criminal Division, and any Deputy Assistant Attorney General of the Criminal Division, to exercise the power conferred by Section 2516 of Title 18, United States Code, to authorize applications to a Federal judge of competent jurisdiction for orders authorizing the interception of wire or oral communications...."

Applying this order to the individuals involved here, it is not disputed that on the date of the Interception Order Application, Mr. Dennis was the Assistant Attorney General in charge of the Criminal Division, and Deputy Assistant Attorney General Keeney was a Deputy Assistant Attorney General of the Criminal Division.

by position is entirely consistent with the legislative history, which indicates that the purpose of the statute was to ensure that intrusive electronic eavesdropping, *see Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1947), be authorized only by a limited group of responsible federal officials. The statute requires that each of the officials be able to trace his or her explicit authority, by designation, to the Attorney General, an official who, by virtue of presidential appointment and Senate confirmation, is publicly responsible and subject to the political process. The statutory limitations allow the responsible persons to be identified and encourage consistency in the policy with which the electronic surveillance power is used. *See* Sen.Rep. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News at 2112, 2185; *United States v. Giordano*, 416 U.S. 505, 514–21, 94 S.Ct. 1820, 1826–29, 40 L.Ed.2d 341 (1974);[4] *United States v. Narducci*, 341 F.Supp. 1107, 1110 (E.D. Pa.1972). The Attorney General's designation of individuals by title is sufficient to ensure these goals of accountability, identification, and consistency. We see no reason to construe the statute to impose a technical requirement that the individuals be designated by name provided their identities are clearly ascertainable at any given time.

Lodato's emphasis—that in *Giordano*, 416 U.S. at 509, 94 S.Ct. at 1823, the intercept application, as well as the chief judge who reviewed the application, stated that "Assistant Attorney General Will Wilson" was specially designated by the Attorney General under Section 2516—is inapposite. There was no issue as to whether Assistant Attorney General Wilson was properly empowered to authorize the intercept application. The dispute arose from the fact that an Executive Assistant had reviewed the request for authorization based on the Attorney General's actions in previous cases

while the Attorney General was away, and had initialed a memorandum to Wilson instructing him to authorize the application. The Supreme Court held that the Executive Assistant was outside the § 2516(1) category of those who could be empowered to approve the application. The *Giordano* decision in no way supports the proposition that individuals must be designated under the statute by name rather than title.

In *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1973), the Supreme Court addressed a situation where the intercept application and order identified Assistant Attorney General Wilson as the authorizing individual, when in fact Wilson had only signed the application as a ministerial act, without substantively reviewing the files. But because Attorney General Mitchell had personally reviewed and approved the request for authority to apply for the intercept order, the Supreme Court ruled that suppression was not required. *Id.* at 566–70, 94 S.Ct. at 1851–53. The Court stated that the legislative purpose of the statutory scheme is to fix responsibility for authorization of the application, and since the Attorney General himself authorized the application, the erroneous identification of Wilson as the authorizing official on the order did not detract from its facial sufficiency. 416 U.S. at 574, 94 S.Ct. at 1855. The Court further stated: "[T]he misidentification of the officer authorizing the wiretap application did not affect the fulfillment of any of the reviewing or approval functions required by Congress...." *Id.* at 575, 94 S.Ct. at 1856. Here, Dennis and Keeney were properly identified on the application and their responsibility was thereby fixed; that the Attorney General did not designate these individuals by name would have no affect on the fulfillment of any of the reviewing or approval functions required by Congress.[5]

---

4. At the time of the *Giordano* decision, Section 2516(1) provided that the Attorney General could only designate Assistant Attorney Generals. The category of those whom the Attorney General could designate under this section has subsequently been expanded.

5. Lodato also contends that the apparently stamped signature of Deputy Assistant Attorney General Keeney suggests that no properly designated official authorized the proposed interception order. However, the Authorization for Interception Order Application memorandum from Dennis to Hess states:

## Exclusion of Answering Machine Message

Lodato next contends that the district court abused its discretion in refusing to admit an answering machine taped message allegedly from Gray, left on the answering machine at Lodato's sister Nancy's house. Defense counsel attempted to introduce the tape to impeach Gray's character and credibility on cross-examination. Lodato contends that the message, in which Gray issued threats against Lodato using vulgar language,[6] would have shown to the jury that Gray was biased against Lodato and was of a character to lie under oath and fabricate a nonexistent conspiratorial relationship between Lodato and himself.

During Gray's cross-examination, Gray denied having any dispute with Lodato around the time of the alleged phone call, denied ever threatening Lodato with physical violence, denied ever having an argument with Lodato's sister, and denied making the statements attributed to him on the tape.[7] Subsequently, defense counsel attempted to introduce a tape of the message allegedly left by Gray, see supra note 6. The government objected on the grounds that the tape was not properly authenticated. In response, defense counsel advised the court that Nancy Germana, Lodato's sister, would testify that the message was left on her machine, and that the voice was that of Gray.

The court held an in camera hearing on the following morning to determine the admissibility of the tape. The tape was played in its entirety. Gray testified, denying it was his voice on the tape, but acknowledging that the return phone number left was his own in late May 1989. After an extended colloquy, the district court determined that more authentication was needed because elsewhere in the tape a number of messages by different voices were left, including messages calling for "K.C.," "Eric," and asking where is "Steve." The court stated that it would consider admitting the tape if a witness

By virtue of the authority vested in him by Section 2516 of Title 18, United States Code, the Attorney General of the United States has by Order Number 1162–86, dated December 12, 1986, designated specific officials in the Criminal Division to authorize applications for court orders authorizing the interception of wire or oral communications. As a duly designated official in the Criminal Division, this power is exercisable by me. WHEREFORE, acting under this delegated power, I hereby authorize the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

There is no evidence in the record contradicting the plain statement in this memorandum that Dennis and/or Keeney did, in fact, authorize the intercept application. We decline to find that the fact that Keeney's signature was stamped rather than originally signed suggests that neither Keeney nor Dennis (both properly designated officials), authorized the intercept application.

6. The transcript of the message allegedly left by Gray was as follows:

Hello, Nance. This is Dan. Hi. Are you there? Answer your phone. Hello, Nancy. Hello. Hello. Hello, Nancy. Answer your phone. This is Danny. Hello, Nancy. This is Danny. Give me a call as soon as you get home, because if I don't have what I paid for today, I'm going to go down to your father's store tomorrow when your dad's there and

I'm going to let your father know how you got paid. And I'm going to make such a fucking free show over there you people aren't going to be very happy. And your sister Janice [Lodato], when I get my hand on her, I'll break her fucking neck, and punch her Pekingese face in. She's like a fucking slime from Africa, and when I get my hands on her, I will punch in her face. I want what belongs to me, and I want it tonight, or there will be a lot of trouble tomorrow. I guarantee you it. Call me at my house as soon as you get it, or else you'll get your problems. Hello, Nancy. You want to give me that call, 641–2923. I'm sure you won't like the problems that I'll bring you tomorrow. Thank you very much. (intermittent answering machine-type "beeps" omitted).

7. Defense counsel questioned Gray as follows:

Q. Do you recall making a telephone call to Nancy's house and leaving a message in her answering machine saying—let me see if I can remember the language. And your sister Janice, when I get my hands on her, I'll break her fucking neck and punch her Pekinese face in?
A. No.
Q. She's like a slime from Africa and when I—
A. No, I never made a phone call to that effect whatsoever, no.
. . . .
Q. As you stand under oath, you didn't make such a call?
A. No, I did not.

would testify as to how the tape was recorded on the machine. The possibility of Lodato's sister offering such testimony was thus left open.

The trial then proceeded. On direct examination of Lodato later that morning, defense counsel again sought to introduce the tape, this time using for authentication Lodato's testimony that she was present at her sister's home when Gray left the message, heard it being recorded, and recognized Gray's voice. Lodato testified that the tape "looks like" the tape her sister removed from the machine and gave her, and which Lodato then gave to defense counsel, "but I can't say for sure it's the same tape."[8] The court refused to admit the tape. At the side bar the court said that at the earlier discussions regarding the tape, defense counsel had never suggested that Lodato herself would authenticate it, nor did counsel make an offer of proof in this regard. Defense counsel responded that he initially thought the sister, Nancy Germana, who removed the tape from the machine, was the better witness, but that since she was unavailable to testify (because she was in a drug rehabilitation center), he decided to rely on Lodato's testi-

mony. The court refused to admit the tape, but permitted Lodato to testify as to what she heard on the tape, which she did.[9]

■ Lodato's testimony that she had recognized Gray's voice at the time the recording was made, *see* Fed.R.Evid. 901, might have sufficed to authenticate it.[10] But Lodato was less than 100% clear, and we have stated that "[t]he admissibility of voice recordings and voice identifications is left to the sound discretion of the trial judge." *United States v. Santana*, 898 F.2d 821, 823–24 (1st Cir.1990) (citation omitted). At the *in camera* hearing conducted specifically to determine the admissibility of the tape, Gray had denied making the calls. Lodato could at that time have offered the same testimony identifying Gray's voice on the tape as she later offered at trial. Defense counsel's only explanation at side bar for failing to have Lodato testify at the *in camera* hearing was that, "I don't always think that fast." Given Gray's denial, the failure to authenticate the tape at the *in camera* proceeding, the confusing messages of callers on the tape for people other than Lodato or her sister, the leading questions on Gray's cross-examination putting the threatening statements attributed

8. Defense counsel then questioned Lodato as follows:

> Q. It looks the same to you? It's the only tape you gave me; right?
> A. Yes.
> Q. Okay. And this is the tape that your sister removed from the machine and gave you?
> A. Yes.

9. Lodato's direct examination, in pertinent part, was as follows:

> Q. Janice, do you recall what Mr. Gray said on the tape?
> A. I was very nervous.
> Q. You don't remember word for word?
> A. No. He was yelling at my sister. And he told her that he was going to—if she didn't give him what, you know, he wanted, or what he had paid for, then he was going to go to my father the next day, and then he started yelling about me, and just called me names and stuff and says he was going to punch me in the face.
> Q. Do you remember if he called you a slime from Africa?
> A. Yeah, he did.
> Q. He was going to punch your Pekingese face in? Did he—
> A. Yeah.

> Q. Was that the period of time when you refused to get him stuff, approximately?
> A. He wanted me to get something for him, but I didn't know where to get it anyway. He wanted me to try to get it at this club I was going to, at the Zoo, and I didn't want to.

10. Fed.R.Evid. 901 provides, in relevant part:

> **(a) General provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
> **(b) Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
> **(1) Testimony of witness with knowledge.** Testimony that a matter is what it is claimed to be.
> . . . .
> **(5) Voice identification.** Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

to Gray before the jury, the tape's limited probative value, and the court's willingness to let Lodato testify to the occurrence and contents of the taped call, the court could reasonably have found, within its discretion, that the tape itself should be excluded. *See* Fed.R.Evid. 403.[11]

### Sentencing: Discretion to Depart Based on Cocaine Dependency

Lodato contends that her history of involuntary cocaine and drug addiction qualified as a mitigating circumstance under U.S.S.G. § 5K1.13 *Diminished Capacity* (Policy Statement).[12] Lodato testified that she was a cocaine addict, that she only started smoking cocaine after she met Gray, that Gray gave her cocaine knowing she was an addict, and paid her for her work at the True Value Hardware store and other odd jobs in cocaine. At her sentencing hearing, Lodato presented affidavits designed to show the involuntariness of her cocaine usage as a result of addic-

tion.[13] She urged the district court to consider this as a mitigating factor warranting a downward departure from the guidelines sentencing range under U.S.S.G. § 5K2.0 *Grounds for Departure* (Policy Statement).[14] The district court ruled that it did not have discretion to depart downward on account of drug dependence, found Lodato's base offense level to be 34, and imposed the minimum sentence within the guidelines range of 151 months imprisonment.[15] Lodato argues on appeal that the court erred in holding it had no discretion to depart downward based on her addiction. While we ordinarily do not have jurisdiction to review a district court's decision not to depart, *see, e.g., United States v. Harotunian,* 920 F.2d 1040, 1044 (1st Cir.1990), there may be occasions to review its conclusion of a lack of legal authority even to consider a departure. *See United States v. Poff,* 926 F.2d 588, 590–91 (7th Cir.1991).

U.S.S.G. § 5K2.0 presents two avenues to a valid departure: (1) a departure may

---

**11.** Fed.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.

**12.** Section 5K2.13 provides:

If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

**13.** Lodato's brother-in-law, Gerard Hevern, a family physician with a sub-specialization in substance abuse, stated in his affidavit that Lodato "has demonstrated all of her characterological traits of a cocaine abuser." He further stated: "even now as she has been incarcerated for the past five months, she is just awakening to the extent of her addiction." Lodato's sister, Donna Hevern, a registered nurse, stated in her affidavit that Lodato has been "totally unable" to control her drug use. She further stated that Gray had a "disastrous" influence on Lodato, "as he provided her with an almost inexhaustible supply of cocaine which she was simply not strong enough to resist." Hevern concluded that, as a result of her addiction, Lodato "be-

came more and more the very 'creature' of Dan Gray" and that Gray "used this advantage in his control of Janice which was evident to me based upon her behavior after she met him."

**14.** Section 5K2.0 provides, in pertinent part:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described....'

**15.** The district court stated:

I also find and rule ... that Guideline 5K2.13, diminished capacity policy statement ... is not applicable to situations here where the accusation and the finding of guilt are based on drug dealing offenses. I find that it applies only as a matter of law to offenses other than such types of offenses. Under the circumstances, therefore, and having given due consideration to your able arguments, and wishing that I was in a position to do something like the doctor says—he ought to address this letter to the Congress of the United States, because I'm not in a position to send people to treatment. I did that quite often before the Guidelines came in, but I can't do it anymore.

be based upon a qualitative "kind" of circumstances not considered by the Sentencing Commission; or (2) a departure may be based upon circumstances which, though considered by the Sentencing Commission, is present "to a degree" or weight "neither readily envisioned nor frequently seen in connection with the offender and/or the offense of conviction." *United States v. Sklar*, 920 F.2d 107, 115 & n. 7 (1st Cir. 1990).

■ We considered the relevance of drug addiction to sentencing in *United States v. Williams*, 891 F.2d 962, 965 (1st Cir.1989). We stated there that the Sentencing Commission, following Congress's direction, *see* 28 U.S.C. § 994(d)(5), took drug addiction into account in drafting the guidelines, stating expressly in U.S.S.G. § 5H1.4, that "[d]rug dependence or alcohol abuse is not a reason for imposing a sentence below the guidelines." The "qualitative" avenue for a departure based on drug addiction is, therefore, foreclosed. *See United States v. Goff*, 907 F.2d 1441, 1445 (4th Cir.1990) ("[T]he district court was clearly in error in justifying a departure, in whole or in part, on Goff's alleged drug addiction."). The Sentencing Commission, in foreclosing downward departures based on drug dependence, recommended that the problem be addressed through requiring drug treatment during the supervised release portion of the sentence.[16]

In *Williams*, we declined to consider whether drug dependence, while "ordinarily" irrelevant to sentencing decisions, might warrant departure in the "rare

case." *Williams*, 891 F.2d at 965 n. 4 (citing *United States v. Taylor*, 868 F.2d 125, 127 (5th Cir.1989)); *but see United States v. Page*, 922 F.2d 534, 535 (9th Cir. 1991) (*per curiam*) ("The district court had no discretion to depart downward based on appellant's alcoholism, irrespective of its extreme nature."); *United States v. Deigert*, 916 F.2d 916, 919 n. 2 (4th Cir.1990) ("[D]rug abuse ... may not, under even extraordinary circumstances, ... support a downward departure."). Here, too, we do not find it necessary to pass on this question. The Sentencing Commission was perfectly aware that many traffickers are drug abusers, who are driven to commit criminal acts in order to feed their habits. *See, e.g., United States v. Ruiz*, 905 F.2d 499, 509 (1st Cir.1990); *Goff, Deigert, supra*. Lodato's cocaine addiction—even if Gray, the "kingpin" of the conspiracy, contributed to it—was not so atypical in drug trafficking offenses as to distinguish her situation from the "mine run," justifying an exception to the general guidelines § 5H1.4 policy statement. The sentence is affirmed.[17]

### *Kathleen Citro & Steven Alonzo*

Appellants Citro and Alonzo both challenge on similar grounds the district court's upward departure in their sentences from the sentencing guidelines. We shall discuss this issue as to each of them.

Background—Citro

As already stated, Citro pleaded guilty to a single count Information charging her under 21 U.S.C. § 843(b) with the unlawful

---

**16.** The full paragraph of § 5H1.4, addressing drug dependence, is as follows:

Drug dependence or alcohol abuse is not a reason for imposing a sentence below the guidelines. Substance abuse is highly correlated to an increased propensity to commit crime. Due to this increased risk, it is highly recommended that a defendant who is incarcerated also be sentenced to supervised release with a requirement that the defendant participate in an appropriate substance abuse program. If participation in a substance abuse program is required, the length of supervised release should take into account the length of time necessary for the supervisory body to judge the success of the program.

**17.** Lodato also contends that the guidelines violate Article III of the United States Constitution in that they deprive the judiciary of fulfilling its traditional discretionary function in sentencing and, by defining substantive rights, violate the Rules Enabling Act, 28 U.S.C. § 2071. The Supreme Court has, however, upheld the constitutional validity of the guidelines, recognizing that the "scope of judicial discretion is subject to congressional control." *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 650, 102 L.Ed.2d 714 (1989). Since the Sentencing Commission, which authored the guidelines, was created pursuant to the Sentencing Reform Act of 1984, 28 U.S.C. § 991 *et seq.*, the scheme does not violate the Rules Enabling Act.

use of a communication facility on November 22, 1988 to cause and facilitate the distribution of cocaine. In common parlance, she pleaded to a "telephone count." In return, the government agreed to, and did, dismiss as to her, Counts 1, 4 and 5 of the indictment. The dismissed counts had charged Citro with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, and two instances of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). Citro's presentence investigation report ("PSI") dated November 30, 1989, summarized the following facts, to which Citro registered no objection: Citro worked at Gray's Golden Acres restaurant from August 1987 to June 1988, during which time she was Gray's primary cocaine courier. Citro delivered ounce quantities of cocaine to various codefendants and other Gray customers; deliveries were made two to three times per week to each customer, and Citro collected money at times for Gray. Citro was paid for her services in cocaine, and she operated her own small scale distribution network out of her residence or a local bar, dealing in quarter and half gram quantities. In November 1988, Citro began purchasing cocaine from Gray for redistribution. On two occasions, Citro sold one-eighth gram quantities of cocaine to undercover police officers. The PSI estimated that Citro trafficked in just under two kilograms of cocaine, most of which was attributable to courier activity and less than 500 grams of which was attributable to redistribution. The PSI placed Citro in the middle range of culpability amongst her coconspirators.

Citro's base offense level for the telephone count under U.S.S.G. § 2D1.6, as then in effect, was 12. She was granted a two-level downward adjustment for acceptance of responsibility, resulting in a guideline sentencing range of 6–12 months. The statutory maximum term of imprisonment for an offense under 21 U.S.C. § 843(b) is four years. The PSI noted that, under the dropped conspiracy and distribution offenses, 21 U.S.C. §§ 841(a)(1) and 846, and based on findings that Citro trafficked in

between 500 grams and two kilograms of cocaine, after adjustment for acceptance of responsibility, Citro's offense level would be 24, with a guideline sentencing range of 51–63 months. The PSI recommended an upward departure on the basis that Citro's actual criminal activity of trafficking in cocaine could be viewed as grossly underrepresented by her plea. The government also moved under U.S.S.G. § 5K1.1 that the court take into consideration Citro's substantial assistance to the government. The district court departed upward, to sentence Citro to thirty months imprisonment. The court noted that the sentence was less than the maximum of four years under the telephone count "to reflect the 5K1 motion of the Government on substantial assistance."

Background—Alonzo

Alonzo pleaded guilty to a two count Information likewise charging him with "telephone counts"—viz. the unlawful use of a communication facility on February 27 and March 1, 1989 to cause and facilitate the distribution of cocaine (a 21 U.S.C. § 841(a) offense, in violation of 21 U.S.C. § 843(b)). Under the plea agreement, the government agreed to dismiss Count 1 of the Indictment, the only indictment charge against Alonzo, which charged him with conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846. The following facts were summarized in Alonzo's PSI: [18] Alonzo served as Gray's primary courier of money and a minimum of fifteen to twenty kilograms of cocaine from at least November 1988 until at least May 1989. The PSI asserted that Alonzo handled ten to fifteen ounces of deliveries per day, that he delivered at least six kilograms of cocaine by the end of December 1988, and delivered at least an additional nine kilograms of cocaine for Gray during 1989. Alonzo was paid between $500 and $2,000 per week in cash and/or cocaine for his courier services. Upon arrest on April 11, 1989, Alonzo was found asleep in his car, in possession of 29 grams of cocaine, a vial of rock cocaine, drug paraphernalia, and extensive drug ledgers. Additional drug paraphernalia were discovered at the motel where

---

**18.** Alonzo withdrew his limited objections to the     PSI at the outset of the sentencing hearing.

Alonzo was staying under an assumed name. The PSI also asserted that Alonzo continued to serve as a courier after his arrest and release on bail. The government placed Alonzo in the high-middle range of culpability.

Alonzo's base offense level for the telephone counts under U.S.S.G. § 2D1.6, as then in effect, was 12. The PSI recommended a two-level downward adjustment for acceptance of responsibility, resulting in an adjusted offense level of 10, and, with a Criminal History Category of III, a guideline sentencing range of 10–16 months. The PSI noted that an upward departure may be warranted on the grounds that Alonzo's criminal trafficking could be viewed as grossly underrepresented by his plea and noted that the maximum term of imprisonment for each count under 21 U.S.C. § 843(b) is four years. The PSI explained that under the charged conspiracy and offense, 21 U.S.C. §§ 841(a)(1) and 846, and based on findings that Alonzo trafficked in between 15 and 50 kilograms of cocaine, Alonzo's adjusted offense level (after adjustment for acceptance of responsibility), would be 32, with a guideline sentencing range of 151–188 months. The district court departed upward to sentence Alonzo to 45 months imprisonment on each telephone count, to be served consecutively, for a total of 90 months imprisonment. In its written statement of reasons, the district court found that Alonzo's "actual criminal trafficking in cocaine is viewed by the Court as grossly underrepresented by the computation of the Guidelines, following a plea to the offenses charged in 21 U.S.C. § 843(b)."

The Upward Departures

■ Citro and Alonzo both appeal from their sentences on the grounds that the district court improperly and unreasonably departed upward under U.S.S.G. § 5K2.0.[19] In *United States v. Diaz–Villafane*, 874 F.2d 43 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989), we described a three-step approach in reviewing departures from the guidelines. The first step—a matter of law, review of which is plenary—is to determine whether the circumstances upon which the district court relied provide legitimate grounds justifying departure. The second step—a question of fact, review of which is for clear error—is to determine whether the circumstances, if legitimate grounds for departure, actually exist in the particular case. *Id.* The third step—a judgment call meriting deference to the district court—is to consider whether the departure under the circumstances was reasonable. *Id.*

At the outset, then, we must consider the legitimacy of the district court's grounds for departure. Both defendants contend that, departing upward, the district court improperly relied upon the amount of cocaine in which each of them trafficked, and improperly relied upon its concern with uniformity of sentences vis-a-vis codefendants in the Gray conspiracy. In both Citro's and Alonzo's cases, the PSIs recommended an upward departure on the grounds that the appellants' actual criminal activity in cocaine trafficking could be viewed as "grossly underrepresented" by their pleas to one or two telephone counts, respectively. The disparity in sentencing ramifications under the guidelines between the pleaded offense and the charged offenses was highlighted in the last paragraph of each PSI, in the sections immediately following the recommendation of upward departures.[20] The district court emphasized,

---

**19.** Section 5K2.0 *Grounds for Departure* (Policy Statement), provides, in pertinent part:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'

**20.** The last paragraph of Citro's PSI states:

The difference between the Guideline range of the Information (i.e., 6–12 months) and the Indictment (i.e., 51–63 months) is substantial. The minimum range (4 years and 3 months) exceeds the four year cap of the charge to which the defendant pled.

The last paragraph of Alonzo's PSI states:

The difference between the Guideline Range of the Information (10–16 months) and the Indictment (151–188 months) is substantial.

in announcing the upward departures and sentences, the extensive drug-trafficking of both defendants over the course of the Gray conspiracy, and particularly emphasized the total amount of cocaine in which each appellant trafficked.[21] The district court also appears to have been influenced by its concern with uniformity of sentences among the various members of the Gray conspiracy to justify the upward departures for Citro and Alonzo.[22]

■ We agree with the government that, under step one of the *Diaz–Villafane* test, the district court legitimately departed up-

---

The minimum range, twelve years and seven months, substantially exceeds even the maximum possible statutory eight year penalty of the two counts to which the defendant pleaded. The plea also shelters the defendant from being sentenced to the mandatory minimum sentence of ten years required by 21 USC 841(b)(1)(A) for trafficking in quantities of cocaine exceeding five kilograms.

**21.** The district court stated at Citro's sentencing hearing:

In this case I am satisfied that the defendant was a trafficker and a redistributor, was more than a courier. She trafficked in just under two kilograms of cocaine. Had she been convicted under the indictment charges of 21 United States Code, Section 841(a)(1) or 846, her Guideline range would have been 51 to 63 months. The lower end of this range would exceed the statutory limit of the telephone statute to which she pled by three months. The amount of cocaine that she trafficked in this case I find to be, whether it's one percent or five-tenths of one percent, is a substantial aggravating factor which merits substantial upward departure.

In its memorandum of statement of reasons for Citro's sentence, the district court stated:

[D]efendant's actual criminal trafficking in cocaine is viewed by the Court as grossly underrepresented by the computation of the Guidelines, following a plea to the offense charged in 21 U.S.C. § 843. Conviction of a violation of 21 U.S.C. § 841(a)(1), Guideline 2D1.1 calls for a base level of 26 points and, reduced by acceptance of responsibility, the computation level of 24, in Category I, would call for a sentence of 51 to 63 months.

Likewise in Alonzo's case, the district court stated at the sentencing hearing:

This is a case, however, where the Court finds and rules that the amount of cocaine involved warrants a reasonable upward departure, and specifically that there exists an aggravating [sic] circumstance of a kind and to a degree not adquately taken into consideration by the Sentencing Commission in formulating the Guidelines and the circumstances are such to warrant individualization of sentence beyond that possible within the Guidelines....

In its memorandum of statement of reasons for Alonzo's sentence, the district court stated:

[D]efendant's actual criminal trafficking in cocaine is viewed by the Court as grossly underrepresented by the computation of the

Guidelines, following a plea to the offense charged in 21 U.S.C. § 843(b). Had defendant been convicted of his drug trafficking offense pursuant to Guideline 2D1.1, his adjusted offense level would have been 32, which at category III would have called for a sentence of 151 to 188 months, or substantially more than the total of the maximum statutory penalties available under consecutive sentencing.

**22.** At Citro's sentencing hearing, the district court stated:

I'm going to find that there are reasonable grounds for an upward adjustment under the circumstances of this case; that uniformity in sentencing which is the goal of these Guidelines, requires that she be sentenced comparatively to those on the same general level with her in this conspiracy.

In its memorandum of statement of reasons for Citro's sentence, the district court noted Citro's relative culpability in relation to other codefendants in the Gray conspiracy and stated:

The uniformity of the Guidelines would be distorted if similar sentences were not awarded to those in similar positions in the course of this drug trafficking scheme. The extent of the defendant's involvement in the case, even when due allowance is made for her assistance to the Government, required that the circumstances here be considered unusual, and the Court has ruled that a reasonable upward departure to 30 months' imprisonment is here warranted. *United States v. Aguilar–Pena*, 887 F.2d 347, 349 (1st Cir.1989).

Likewise in Alonzo's case, the district court stated in its memorandum of reasons for the sentence:

While the defendant was not in the absolute top range of co-defendants involved in this operation, his activity over a considerable period of time in serving as both courier and distributor placed him in a range with other codefendants such that the original Guideline of 2D1.6 would not fairly represent the scope of his offenses. The uniformity of the Guidelines would be distorted if similar sentences were not awarded to those in similar positions in the course of this drug trafficking scheme. The extent of the defendant's involvement in this case required that the circumstances here be considered unusual, and the Court has ruled that a reasonable upward departure to 45 months on each of the counts, to be served consecutively, is here warranted. *United States v. Aguilar–Pena*, 887 F.2d 347, 349 (1st Cir.1989).

wards. While questionable in theory, the upward departure was warranted under special circumstances then pertaining to sentencing under the telephone count statute, 21 U.S.C. § 843(b). At the time, § 2D1.6 of the guidelines provided simply that the base offense level for a telephone offense was "12." The guidelines took no account of the underlying drug conduct facilitated by use of the telephone. Thus, unlike other drug offenses, there was no provision for raising or lowering the guideline penalty on the basis of the amount of drugs involved.

Section 2D1.6 was subsequently amended, effective November 1, 1990, to provide that the base offense level for the telephone count is now "the offense level applicable to the underlying offense." The amended commentary to § 2D1.6 expressly states that the guidelines were amended to address the need to take account of the scale of the underlying drug transaction under a telephone count:

> This amendment is designed to reduce unwarranted disparity by requiring consideration in the guideline of the amount of the controlled substance involved in the offense.... Frequently, a conviction under [the unlawful use of a communications facility statute, 21 U.S.C. § 843(b)] is the result of a plea bargain because the statute has a low maximum ... and no mandatory minimum. The current guideline has a base offense level of 12 and no specific offense characteristics. Therefore, the scale of the underlying drug offense is not reflected in the guideline. *This results in a departure from the guideline range frequently being warranted.* Without guidance as to whether or how far to depart, the potential for unwarranted disparity is substantial. Under this amendment, the guideline itself will take into account the scale of the underlying offense. (Emphasis supplied.)

Prior to the amendment, other circuits held that the amount of drugs involved in the underlying offense could be considered to be an aggravating factor meriting an upward departure when the defendant pleads to a telephone count. *United States*

*v. Bennett,* 900 F.2d 204, 206 (9th Cir.1990); *United States v. Williams* 895 F.2d 435, 437–38 (8th Cir.1990); *United States v. Correa–Vargas,* 860 F.2d 35, 38 (2d Cir. 1988); *cf. United States v. Garza,* 884 F.2d 181, 183–84 (5th Cir.1989) (pursuant to guidelines § 1B1.2(a), the district court could sentence defendant after guilty plea to telephone count according to more serious offense conduct stipulated in the plea agreement, so court's departure based on stipulated actual conduct achieving same result affirmed).

More recently, but still operating under the old guideline provision applicable here, the Sixth Circuit upheld an upward departure from a telephone count on facts not unlike the present. *United States v. Anders,* 899 F.2d 570, 581 (1990). Noting among others the fact that "the transaction which was the subject of the prosecution involved a large quantity of drugs," the court departed upward, in the case of codefendant Weddle, from the guideline base level of 12 (reduced to 10) to a much more severe penalty. *Id.* at 573. As here, the plea agreement involved dropping earlier counts of possession with intent to distribute and conspiracy.

Given these precedents, and, more important, the Commission's statement in the amended commentary that the rigidity of the guideline as then written "results in a departure from the guideline range frequently being warranted," we think there were clearly legitimate grounds here for departure, that is, there existed aggravating circumstances of a kind or to a degree not adequately taken into consideration by the Sentencing Commission. U.S.S.G. § 5K2.0.

It is true that U.S.S.G. § 6B1.2(a) (policy statement) provides that:

> In the case of a plea agreement that includes the dismissal of any charges ... the court may accept the agreement *if the court determines ... that the remaining charges adequately reflect the seriousness of the actual offense behavior....*

(Emphasis supplied.) This provision has led us to question a court's upward departure for more serious conduct after it has accepted a plea bargain dropping the more serious charges. We asked why the court accepted the bargain in the first place if it believed that defendant's punishment should reflect the more serious conduct. *United States v. Plaza–Garcia*, 914 F.2d 345, 348 (1st Cir.1990). Absent very special circumstances (as also mentioned in *Plaza–Garcia*, 914 F.2d at 348), we think that punishing for conduct covered solely by dropped charges is ordinarily a dubious basis for an upward departure.[23] But, as explained, the present instance does involve a special situation: the telephone offense guideline, as originally written, should have reflected but did not, the relevant amount of drugs. The Sentencing Commission concedes that this omission was an oversight. The court, therefore, legitimately took this factor into account, as an aggravating factor warranting upward departure. To be sure, there was no evidence as to the specific amounts of cocaine to which the particular telephone calls referred; but under guideline policy these amounts could be enhanced by other drugs the defendant distributed as "part of the same course of conduct or common scheme or plan...." U.S.S.G. § 1B1.3(a)(2).

In brief, the departure was appropriate under the circumstances of this particular guideline—although it might not have been otherwise—as a reasonable attempt to connect defendants' heavy-duty trafficking with the facilitating phone calls.[24]

We add that defendants received the benefit of their bargain. Had they been sentenced under the dropped charges rather than the telephone offense, their normal sentences would have been considerably higher.

 We hold as to the departures in Citro's and Alonzo's cases that all three *Villafane* elements were met. The upward departure was not only legitimate but based on justifiable grounds and reasonable. The drug trafficking conduct which the court took into account was set out as to both individuals in their PSI. As no objection was registered to the description there, these facts could be accepted as true and accurate. *United States v. Fox*, 889 F.2d 357, 359 (1st Cir.1989).

While holding that the upward departure was both justified and reasonable in this situation, we repeat that our decision is exceedingly narrow. It rests on the unusual character of § 2D1.6 as then written, and its subsequent history (including the Commission's specific approval of upward departure to accommodate the underlying drug trafficking). Absent these special characteristics, we might well reach a different conclusion as to the propriety of the upward departure.

We have considered appellants' other arguments and hold they are without merit. As to Alonzo's ineffective assistance of counsel claim, we decline to consider it on direct appeal. *See United States v. Arango–Echeberry*, 927 F.2d 35, 38–39 (1st Cir. 1991).

*Affirmed.*

---

**23.** We also note that in this case, unlike in *Plaza–Garcia,* the dropped conspiracy charges constituted a manner of carrying out the instances of cocaine distribution that were the subject of the telephone counts. In *Plaza–Garcia,* the "dropped charge" conduct consisted of *other* sex violations with *other* persons, which was repetitious of but not otherwise related to the count of conviction. 914 F.2d at 346. Thus, here, unlike in *Plaza–Garcia,* the cocaine distribution conspiracy could be viewed as an aspect of the telephone count conduct, for which the defendants could have expected to be held accountable at sentencing.

**24.** Had departure merely reflected the court's wish to equalize sentencing outcomes as between defendants (see note 22, *supra* ), this would have been, without more, an improper reason to depart. *United States v. Wogan,* 938 F.2d 1446, 1448–49 (1st Cir.1991) (citing other First Circuit cases). As, however, other compelling and justifiable reasons to depart exist, the sentence properly stands. *See United States v. Diaz–Bastardo,* 929 F.2d 798, 800 (1st Cir.1991).