[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10300
_____

D.C. Docket No. 5:11-cr-00399-KOB-RRA-9

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM DEMETRO HOLDEN,
MICHAEL ARNEZ BROWN, et al.,

Defendants-Appellants.

_____

No. 13-14480
_____

D.C. Docket No. 5:12-cr-00329-KOB-TMP-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MYRON DEWAYNE TIBBS,

                                                    Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(February 11, 2015)

Before MARTIN and ANDERSON, Circuit Judges, and COTE,[*] District Judge.

_____

[*] Honorable Denise Cote, United States District Judge for the Southern District of New York,
sitting by designation.

PER CURIAM:

This is a consolidated direct appeal of final judgments entered against four criminal defendants. For the reasons that follow we affirm the convictions.

## I. BACKGROUND

On December 29, 2011, a twenty-six count superseding indictment was filed in the U.S. District Court for the Northern District of Alabama in case number 11cr399 (KOB) against fifteen individuals, including the four appellants: Kingy Ossarius Holden ("Kingy"), Myron Dewayne Tibbs ("Tibbs"), Michael Arnez Brown ("Brown"), and William Demetro Holden ("William"), who is Kingy's younger brother. The superseding indictment charged the defendants with being part of a drug distribution ring, with Kingy at its center. Count One (the "Cocaine Conspiracy") charged ten of the defendants, including Kingy and Tibbs, with conspiring to possess with intent to distribute, and to distribute, five kilograms or more of cocaine and 280 grams or more of a mixture and substance containing a detectable amount of cocaine base, also known as "crack," from 2002 to 2011. Count Two (the "Marijuana Conspiracy") charged nine of the defendants, including all four appellants, with conspiring to possess with intent to distribute, and to distribute, one thousand kilograms or more of marijuana from 2002 to 2011. Counts Three through Six charged Kingy with distributing marijuana on specific dates.

Count Eleven charged Kingy with being a felon in possession of a firearm. Count Eighteen charged Tibbs with being a felon in possession of a firearm. Counts Twenty-Three through Twenty-Six charged Kingy and one of the non-appellants with money laundering.

The remaining counts variously charged certain of the non-appellant defendants with, among other things, possessing with intent to distribute cocaine and crack, distributing cocaine, distributing marijuana, possessing a firearm with intent to distribute narcotics, and being a felon in possession of a firearm. Each of the eleven non-appellants named in the indictment either pled guilty or had the charges against him or her dismissed. The four appellants jointly proceeded to trial.

Prior to trial, three of the appellants -- Kingy, Tibbs, and Brown -- moved to suppress recordings of calls, and any evidence derived from those calls, intercepted by wiretaps on Kingy's telephone. On July 5, 2012, their motions to suppress were denied.

Also prior to trial, on July 18, at the Government's request, Count Eighteen, charging Tibbs with being a felon in possession of a firearm, was dismissed without prejudice. The record reveals that the dismissal was based on the Government's realization that it had failed to present the grand jury with evidence to support the charge. After the dismissal of Count Eighteen, a separate, one count

4

indictment was filed against Tibbs on July 31, 2012 in the U.S. District Court for the Northern District of Alabama in case number 12cr329 (KOB), charging him with being a felon in possession of a firearm.  It is undisputed that the new indictment was based on the same facts underlying the dismissed count in case number 11cr399 (KOB).

Trial commenced in case number 11cr399 (KOB) on July 23, 2012.  The Government's evidence largely consisted of the testimony of several of the non-appellants named in the indictment, who cooperated with the Government, the testimony of federal agents, and recordings of wiretapped calls made from and to Kingy's telephone.  In general terms, the evidence established that Kingy was at the center of a marijuana-distribution scheme, supplying marijuana to several of the other defendants for resale.

The evidence against Kingy included recordings of numerous drug-related conversations he had with others.  The evidence against Tibbs consisted of the testimony of agent Patrick Boyd ("Boyd"), the testimony of a cooperating co-defendant, and twelve recorded telephone calls between Kingy and Tibbs.  The evidence against Brown consisted solely of recorded telephone conversations between him and Kingy.  The evidence against William consisted solely of the testimony of one of the non-appellant cooperators, who is William's ex-girlfriend and the mother of his child.

5

On August 1, before the Government rested, it was granted a motion to dismiss one of the four money-laundering counts against Kingy, and it announced that, as to the Cocaine Conspiracy count, which referred to both cocaine and crack, the Government would proceed only with respect to the cocaine and not with respect to the crack. After the Government rested on August 1, each defendant moved for a judgment of acquittal under Fed. R. Crim. P. 29(a). The motions were denied.

On August 3, the jury returned special verdicts. On the Cocaine Conspiracy count, Kingy and Tibbs were found not guilty; Kingy was also found not guilty on the three remaining money-laundering counts, but was found guilty on the four counts of distributing marijuana and on the one count of being a felon in possession of a firearm. On the Marijuana Conspiracy count, Kingy was found guilty of conspiring to possess with intent to distribute, and to distribute, marijuana weighing one thousand kilograms or more -- the amount charged in the indictment; Tibbs, Brown, and William were found guilty of the lesser included offense of conspiring to possess with intent to distribute, and to distribute, marijuana weighing less than one hundred kilograms -- the smallest quantity for which the jury could find them responsible.[1]

---

[1] The statutory subsection pursuant to which the indictment charged the Marijuana Conspiracy refers to one thousand kilograms or more of marijuana. 21 U.S.C § 841(b)(1)(A). In the event that the jury found a defendant guilty of the Marijuana Conspiracy, the special verdict form forced the jury to check one of three boxes, corresponding to the amount of marijuana for which

In case number 12cr329 (KOB), on September 6, Tibbs again moved to suppress the evidence derived from the wiretaps on Kingy's telephone. Based on the intercepted conversations between Kingy and Tibbs, agents had obtained a search warrant for Tibbs's home and had discovered the firearm that formed the basis of the felon-in-possession charge ultimately brought in case number 12cr329 (KOB). Tibbs's motion to suppress was denied. On October 17, Tibbs moved to dismiss the indictment in case number 12cr329 (KOB) based on an alleged violation of the Speedy Trial Act. This motion to dismiss was denied. On December 17, Tibbs pled guilty to the felon-in-possession charge in case number 12cr329 (KOB), reserving his right to appeal the denial of these motions.

Judgment entered against William on January 9, 2013; he was sentenced principally to thirteen months' imprisonment. Judgment entered against Brown on January 24; he was sentenced principally to twenty-four months' imprisonment. Judgment entered against Kingy on April 15; he was sentenced principally to 365 months' imprisonment on the Marijuana Conspiracy count, and to 120 months' imprisonment on the marijuana distribution counts and felon-in-possession count,

---

the jury found him responsible: (1) one thousand kilograms or more, (2) one hundred kilograms or more, but less than one thousand kilograms, or (3) less than one hundred kilograms. The jury checked the first box for Kingy and the third box for the other three appellants. Accordingly, judgment was imposed against Kingy on the Marijuana Conspiracy count pursuant to the same statutory subsection listed in the indictment. Judgment was imposed against the other three appellants, however, pursuant to a different statutory subsection, which refers to less than fifty kilograms of marijuana (which is itself less than the one hundred kilograms for which the jury found each of them responsible on the special verdict forms). Id. § 841(b)(1)(D).

7

to run concurrently.  Judgment entered against Tibbs in both cases on September 23; he was sentenced principally to 120 months' imprisonment on both the Marijuana Conspiracy count from case number 11cr399 (KOB) and the felon-in-possession count from case number 12cr329 (KOB), to run concurrently.  This timely appeal followed.

## II. DISCUSSION

Appellants raise a number of issues.[2]  Kingy and Tibbs argue that the district court erred in denying the motions to suppress the wiretaps.  Tibbs, Brown, and William claim that the district court erred in denying the Rule 29(a) motions for a judgment of acquittal.  Tibbs and Brown further assert that there was a material variance between what was charged in the indictment with respect to the Marijuana Conspiracy and what was proved at trial.  Tibbs additionally contends that the district court erred in denying his motion to dismiss in case number 12cr329 (KOB) based on the Speedy Trial Act.

A.    Suppression of Evidence

Two applications were made and granted for wiretaps on Kingy's telephone.  The first was made and granted on July 20, 2011.  After the interception period associated with the July 20 application had expired, a subsequent application was made and granted on August 22, 2011.  Neither application was accompanied by a

---

[2] Each appellant submitted his own brief.  William's explicitly adopted the arguments of the other appellants.

8

Department of Justice ("DOJ") authorization memo.  Additionally, while the August 22 application identified the authorizing official as Deputy Assistant Attorney General Jason M. Weinstein ("Weinstein"), it turned out that the application was authorized not by Weinstein but by Deputy Assistant Attorney General Kenneth Blanco ("Blanco").  It is undisputed that both Weinstein and Blanco had the appropriate authority to authorize a wiretap application.

Appellants make several arguments as to why the district court erred in denying the motions to suppress.  Kingy argues that the wiretap evidence should have been suppressed both because the wiretap applications were not accompanied by DOJ authorization memos and because the August 22 application misidentified the authorizing official.  Tibbs makes the separate argument that the applications failed to establish the necessity of the wiretaps.  These arguments are addressed in turn.

"In reviewing a district court's denial of a motion to suppress, we review the findings of fact for clear error and the application of law to those facts de novo."  United States v. Lee, 586 F.3d 859, 864 (11th Cir. 2009) (citation omitted).  "When considering a ruling on a motion to suppress, we construe all facts in the light most favorable to the party prevailing in the district court -- here, the government."  United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008).

1.   Absence of DOJ authorization memo and misidentification of authorizing official

By statute, both a wiretap application and a court order approving that application must specify the identity of the DOJ official who authorized the application -- the "authorizing official." See 18 U.S.C. § 2518(1)(a), (4)(d).  Only certain individuals in the DOJ have the power to serve as authorizing officials.  See id. § 2516(1).  It is apparently common practice for a wiretap application to be accompanied by a DOJ authorization memo, which further identifies the authorizing official.  That being said, while the statute requires that the application itself include the identity of the authorizing official, the statute does not require that the application be accompanied by documentation substantiating that identification.

Here, Kingy points to no authority, and we have found none, holding that the absence of a DOJ authorization memo, standing alone, justifies suppression.  The First Circuit recently rejected an argument similar to Kingy's.  See United States v. Lyons, 740 F.3d 702, 722-23 & n.6 (1st Cir. 2014).[3]

We turn next to the argument based on the misidentification of the authorizing official in the August 22 application.  Wiretap evidence may be

---

[3] Kingy complains that the wiretap applications were accompanied by neither a DOJ authorization memo nor an "Attorney General's Order of Special Designation" -- the document wherein the Attorney General grants authority to others in the DOJ to authorize wiretaps.  What we have said about the lack of a DOJ authorization memo applies with equal force to the lack of an order of special designation.

10

suppressed if, among other things, it was unlawfully intercepted or the court approval order was insufficient on its face. See 18 U.S.C. § 2518(10)(a)(i)-(ii). The Supreme Court has clarified, however, that facial insufficiency -- in a wiretap application or approval order -- that amounts to a mere technical defect need not result in suppression. See United States v. Chavez, 416 U.S. 562, 579-80 (1974); United States v. Giordano, 416 U.S. 505, 527 (1974). Rather, suppression is required only if the statutory requirement that was violated occupies a central, functional role in guarding against unwarranted use of wiretapping. Chavez, 416 U.S. at 574-80; Giordano, 416 U.S. at 527-28.

In Giordano, the wiretap application identified as the authorizing official a DOJ officer with the requisite statutory authority. 416 U.S. at 508-09. In other words, the application and ensuing approval order were facially sufficient. It turned out, however, that the application had in fact putatively been authorized by a different DOJ officer, who lacked the necessary authority. Id. at 509-10. Reasoning that "the provision for pre-application approval was intended to play a central role in the statutory scheme," the Court held that the evidence had been unlawfully intercepted and that suppression was appropriate. Id. at 528.

In Chavez, like in Giordano, the wiretap application identified as the authorizing official a DOJ officer with the requisite statutory authority, such that the application and ensuing approval order were facially sufficient. 416 U.S. 566.

11

And like in <u>Giordano</u>, it turned out that the person identified on the application was not, in fact, the person who had provided authorization. <u>Id.</u> at 570. Unlike <u>Giordano</u>, however, the person who had actually provided authorization in <u>Chavez</u> in fact possessed the necessary statutory authority. <u>Id.</u> at 574. Because the statutory requirement of pre-application approval by an appropriate officer had not been violated, the Court held that suppression was not necessary. <u>Id.</u> at 568-69.

Here, with respect to the August 22 application's misidentification of the authorizing official, Kingy's argument is foreclosed by <u>Chavez</u>. Like in <u>Chavez</u>, the August 22 application identified an appropriate DOJ officer as the authorizing official, but it turned out that the person who had actually provided authorization was a different, although equally appropriate, DOJ officer. Because the statutory requirement of pre-application approval by an appropriate officer was in fact satisfied, suppression was not necessary.

The case on which Kingy principally relies, <u>United States v. Lomeli</u>, 676 F.3d 734 (8th Cir. 2012), is distinguishable in at least two ways. First, there, unlike here, the application was deemed facially insufficient in that it did not specify the name or position of the authorizing official; instead, the application merely said that authorization had been provided by "an appropriate official of the Criminal Division [of the DOJ]." <u>Id.</u> at 740. Second, there, unlike here, the

12

Government offered no indication that the identity of the authorizing official was ever revealed.  Id. at 741.

2.    Necessity

Tibbs contends that the motion to suppress should have been granted because the Government failed to make the requisite showing of necessity.  This argument fails as well.

By statute, "[e]ach [wiretap] application shall include . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  This provision is referred to as the "necessity requirement" of a wiretap application.

> The "necessity" requirement in § 2518 ensures that law enforcement does not use electronic surveillance when less intrusive methods will suffice.  Section 2518 does not foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted; however, it does require the Government to show why alternative measures are inadequate for this particular investigation. . . .  The partial success of alternative investigative measures, however, does not necessarily render electronic surveillance unnecessary.

United States v. Perez, 661 F.3d 568, 581 (11th Cir. 2011) (citation omitted).

Here, the necessity requirement was satisfied.  The affidavit in support of the wiretap applications sufficiently explained why "investigative techniques that reasonably suggest themselves" were insufficient in this case.  United States v. De

13

La Cruz Suarez, 601 F.3d 1202, 1214 (11th Cir. 2010) (citation omitted).  That affidavit outlined in detail the traditional investigative techniques that either had been employed or had not been attempted based on dangerousness or a lack of probability of success.  As detailed in the affidavit, alternative investigative measures such as Government informants and physical surveillance, while successful in obtaining some information, were insufficient for agents to determine all the methods, patterns, and members -- in short, the full scope -- of the drug distribution conspiracies.

The district court did not err in denying the motions to suppress evidence derived from the wiretaps on Kingy's telephone.

B.    Sufficiency of the Evidence

Tibbs, Brown, and William argue that the district court erred in denying the Rule 29(a) motions for a judgment of acquittal on the ground that the evidence was insufficient to support a conviction on all counts.  We address this argument as to each of them.  While each of the three defendants argued in their Rule 29 motions that there was insufficient evidence that they were engaged in the conspiracy to distribute marijuana as charged in the indictment, none of them objected that Boyd was not qualified to give expert testimony about coded language for marijuana or should not have been permitted to identify Tibbs's voice on the tape recordings. Even if these arguments had been preserved, however, we see no error.

14

"We review the denial of a motion for judgment of acquittal de novo, but viewing the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." United States v. Barsoum, 763 F.3d 1321, 1329-30 (11th Cir. 2014) (citation omitted). "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt. The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." United States v. Capers, 708 F.3d 1286, 1297 (11th Cir. 2013) (citation omitted).

1.    Tibbs

Tibbs argues that his conviction on the Marijuana Conspiracy count was not supported by sufficient evidence, because it was substantially premised on the testimony of Boyd, which Tibbs claims was inadmissible in two ways. Without this testimony, Tibbs says there would have been insufficient evidence to convict. "We review for an abuse of discretion evidentiary rulings of the district court to which a timely objection is made . . . ." United States v. Joseph, 709 F.3d 1082, 1093 (11th Cir. 2013).

First, Tibbs argues that Boyd should not have been permitted to testify as an expert on drug trafficking slang. "The operations of narcotics dealers, including

drug codes and jargon, are proper subjects of expert testimony." United States v. Emmanuel, 565 F.3d 1324, 1335 (11th Cir. 2009). Pursuant to Fed. R. Evid. 702(c)-(d), "[a] witness who is qualified as an expert . . . may testify . . . if [inter alia] the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case." According to the Advisory Committee Notes to the 2000 amendments to Rule 702, "when a law enforcement agent testifies regarding the use of code words in a drug transaction, . . . [t]he method used by the agent is the application of extensive experience to analyze the meaning of the conversations." Tibbs contends that the Government failed to establish that Boyd possessed the required "extensive experience."

At the time of trial, Boyd had served in the FBI for seven years. For the two years before trial, he had been based in Alabama, focusing primarily on drug violations and drug-related organized crime. Prior to that, he had served in San Diego, dealing exclusively with drug-related organized crime. He had received extensive training on narcotics and narcotics trafficking, including specific training on drug slang and codes. At the time of trial, Boyd had participated in forty to fifty drug distribution investigations, and all of the cases in his seven-year career had involved marijuana to some extent. He had been involved with at least a dozen wiretaps and had previously heard slang and code words for marijuana. One of the

16

ways that he learned the meaning of such words was through interactions with other law-enforcement officers and with numerous cooperating drug informants. The district court acted well within its discretion in determining that Boyd's experience rises to the level of "extensive."

Tibbs argues that the district court failed to mitigate sufficiently the risk of prejudice presented by Boyd's dual role as fact and expert witness. When the Government selects as its expert on code the lead agent in the investigation, it "increases the likelihood that inadmissible and prejudicial testimony will be proffered." United States v. Dukagjini, 326 F.3d 45, 53 (2d Cir. 2003). "The concern is that 'particular difficulties, warranting vigilance by the trial court, arise when an expert, who is also the case agent, goes beyond interpreting code words and summarizes his beliefs about the defendant's conduct based upon his knowledge of the case.'" Emmanuel, 565 F.3d at 1335 (quoting Dukagjini, 326 F.3d at 53). "Although we decline to prohibit categorically the use of case agents as experts," we admonish prosecutors that the better practice is to avoid doing so. Dukagjini, 326 F.3d at 56. Here, there was no prejudice from the selection of the lead agent to discuss slang for marijuana. The defendants at trial did not dispute that the wiretapped conversations discussed the distribution of marijuana. They did hotly contest, however, whether the conversations included references to

17

cocaine.  Since the two appellants charged in the Cocaine Count were acquitted of that charge, this issue does not require further discussion.

Second, Tibbs argues that the district court erroneously allowed Boyd to make a voice identification without an adequate foundation.[4]  According to Fed. R. Evid. 901, "[a]n opinion identifying a person's voice -- whether heard firsthand or through mechanical or electronic transmission or recording -- based on hearing the voice at any time under circumstances that connect it with the alleged speaker" constitutes "evidence that satisfies the requirement" "of authenticating or identifying an item of evidence."

Such an opinion was offered here.  Boyd testified that he had previously spoken with Tibbs in person, and that, in his opinion, it was Tibbs's voice on the recordings.  We perceive no abuse of discretion in the district court's permitting Boyd to make a voice identification of Tibbs.

The district court did not abuse its discretion in admitting Boyd's testimony, and, in light of that testimony, there was sufficient evidence to find Tibbs guilty of conspiring to distribute, or to possess with intent to distribute, marijuana.[5]

---

[4] The parties dispute whether this argument was preserved.  Even assuming that it was, we see no error.

[5] Separate from his attacks on Boyd's testimony, Tibbs argues that the district court abused its discretion under Fed. R. Evid. 403 in admitting, as evidence of Tibbs's consciousness of guilt, testimony from one of the cooperating defendants that Tibbs encouraged him to refrain from pleading guilty by explaining that "something [was] going to happen" to another of the defendants who was already cooperating with the Government.  The implication, presumably,

2.    Brown

Brown argues that, while the recordings played at trial fairly indicate that both he and Kingy were involved in the distribution of marijuana, those recordings do not show that the two men sold marijuana as part of the same conspiracy. This argument is easily dismissed.

Brown acknowledges that the conversations establish that he purchased marijuana from Kingy. For example, in one conversation, Kingy advises Brown to sell the marijuana that Brown purchased from him. But, says Brown, there are no recorded conversations confirming that such resales actually occurred, or that the proceeds of any resales were paid by Brown to Kingy or divided between the two of them. Viewing all the evidence in the light most favorable to the Government, however, the jury could have reasonably inferred beyond a reasonable doubt that Kingy and Brown conspired to distribute marijuana.

3.    William

William argues that the evidence was insufficient because the testimony of his ex-girlfriend was vague, as she testified that she brought marijuana to William at Kingy's request "ten to twenty" times, but was unable to specify any exact dates

---

was that this already-cooperating defendant might be killed, such that the Government would no longer have a case against the rest of them. Assuming arguendo that this particular evidence was overly prejudicial under Rule 403, its erroneous admission was harmless in light of the otherwise overwhelming evidence of guilt to support Tibbs's conviction for the Marijuana Conspiracy, including the wiretapped telephone calls between him and Kingy. See United States v. Sterling, 738 F.3d 228, 239 (11th Cir. 2013).

or times.  William cites no authority to support the proposition that such specificity was required.

To sustain the conviction for conspiracy to possess with intent to distribute and to distribute marijuana, the Government was required to offer sufficient evidence to prove beyond a reasonable doubt that: (1) an illegal agreement existed to possess with intent to distribute or to distribute marijuana; (2) William knew of the agreement; and (3) William knowingly and voluntarily joined the agreement. United States v. Isnadin, 742 F.3d 1278, 1305 (11th Cir. 2014).  Although the Government was not required to prove that William knew every detail or participated in every stage of the conspiracy, it must have established that he knew the essential nature of the conspiracy.  Id.

Here, that showing was made.  William's ex-girlfriend testified that she held marijuana for Kingy from 2010 to 2011 and that, during this time, at Kingy's request she would bring marijuana to William, who would then contact someone to come pick it up.  She additionally testified that she would hold drug proceeds for Kingy, and that, on several occasions, it was William who brought the money to her on Kingy's behalf.

20

C.    Material Variance

Tibbs and Brown contend that there was a material variance between what was charged in the indictment and what was proved at trial.[6]  The indictment, in the Marijuana Conspiracy count, charged that nine individuals, including all four appellants, conspired to possess with intent to distribute, and to distribute, one thousand kilograms or more of marijuana from 2002 to 2011.  Tibbs and Brown say that, in contrast to this single conspiracy consisting of nine individuals, the proof at trial showed, at most, multiple, independent conspiracies, each consisting of Kingy and one other individual.

"We will not reverse a conviction because a single conspiracy is charged in the indictment yet multiple conspiracies were proved at trial unless the variance . . . (1) [is] material and (2) substantially prejudiced the defendant."  Barsoum, 763 F.3d at 1330.  For present purposes, we will assume, arguendo, that there was a material variance.  The analysis thus turns to substantial prejudice.  "To demonstrate substantial prejudice, a defendant must show either: 1) that the proof at trial differed so greatly from the charges that he was unfairly surprised and was unable to prepare an adequate defense; or 2) that there are so many defendants and

---

[6] The parties dispute whether these arguments were preserved.  In his brief, Tibbs conceded that he never made the material variance argument below, and that it should thus be reviewed for plain error.  At oral argument, however, counsel for Tibbs indicated that conceding forfeiture may have been a mistake; he pointed to statements made during the Rule 29(a) conference that seem to indicate that counsel for both Tibbs and Brown made a material variance argument.  Nonetheless, the Government contends that the material variance argument was not preserved.  Even assuming it was preserved, however, it fails for the reasons discussed below.

21

separate conspiracies before the jury that there is a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another." Id. (citation omitted).  Tibbs and Brown do not, and could not, invoke the first alternative for demonstrating substantial prejudice.  Thus, the question is whether they have shown that there is a substantial likelihood that the jury transferred proof between different conspiracies.

They cannot make this showing.  Had the jury found either of Tibbs or Brown (or William, who joins the arguments of the others) responsible for a drug quantity greater than the smallest possible amount, there might be cause to wonder whether the jury had transferred to that individual proof of another of the conspiracies.  But the jury found each of Tibbs, Brown, and William guilty of conspiring to possess with intent to distribute, or to distribute, marijuana weighing less than one hundred kilograms, which was the smallest possible quantity that the jury could have attributed to each defendant.  The jury found Kingy guilty of conspiring to possess with intent to distribute, or to distribute, marijuana weighing one thousand kilograms or more.  Since, as discussed above, there was sufficient evidence for the jury to find that, at the very least, each of Tibbs, Brown, and William independently participated in a distinct conspiracy with Kingy to distribute, or to possess with intent to distribute, marijuana, they cannot show they

were prejudiced by any material variance between the indictment and the proof at trial.

D.    Speedy Trial Act

Tibbs argues that the district court erred in denying his motion to dismiss the felon-in-possession charge in case number 12cr329 (KOB) based on the Speedy Trial Act ("STA"), 18 U.S.C. § 3161.  "We review a claim under the Speedy Trial Act de novo and review a district court's factual determinations on excludable time for clear error."  United States v. Isaacson, 752 F.3d 1291, 1300 (11th Cir. 2014) (citation omitted).

According to Tibbs's calculations, seventy-five unexcluded days elapsed on the felon-in-possession charge, five more than the seventy days permitted by § (c)(1) of the STA.  To dispose of this issue, it will suffice to show that Tibbs's calculations are exaggerated by at least five days.  Under Tibbs's calculations, following the July 18, 2012 dismissal without prejudice of Count Eighteen in case number 11cr399 (KOB), the clock restarted on August 1, which, according to Tibbs, is the date the indictment in case number 12cr329 (KOB) was publicly docketed.  Since the docket sheet lists July 31 as the date on which the indictment was filed, we shall adopt that earlier date for the purposes of Tibbs's argument.

As it turns out, however, the date on which this indictment was filed does not matter for purposes of the STA calculation.  Section (h)(5) of the STA provides

23

that "[i]f the . . . indictment is dismissed upon motion of the attorney for the Government and thereafter a charge is filed against the defendant for the same offense, . . . any period of delay from the date the charge was dismissed to the date the time limitation would commence to run as to the subsequent charge had there been no previous charge [is excluded]."  And "the date the time limitation would commence to run as to the subsequent charge had there been no previous charge," is, according to § (c)(1), "the filing date (and making public) of the . . . indictment, or . . . the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs" (emphasis added).  In short, when, as here, a charge is dismissed on the Government's motion and then the Government reindicts the defendant for the same offense, the STA clock begins to run again upon the later of either (1) reindictment or (2) rearraignment.  Here, Tibbs was arraigned on the charge in case number 12cr329 (KOB) on August 22.  In other words, Tibbs's calculations should have restarted the clock on August 22, not, as they did, on August 1.  Considering this erroneous twenty-one day addition to the calculation, Tibbs's seventy-five day total is not problematic.

In support of his position that the clock restarts upon reindictment, not rearraignment, Tibbs directs us to two cases.  In United States v. Young, we said:

> [The STA] provides that the time between the dismissal of an
> indictment and any subsequent charge for the same offense . . . is
> excluded from the speedy-trial calculation.  Thus, if the government
> indicts a defendant for a particular crime, dismisses that charge, and

24

indicts the defendant once again for the same offense, the speedy-trial calculation begins with the <u>initial</u> indictment or arraignment but excludes the time between the dismissal and subsequent re-indictment.

528 F.3d 1294, 1295-96 (11th Cir. 2008) (emphasis in original).  And in <u>United States v. Broadwater</u>, we said that "[i]f the government moves to dismiss a count following a mistrial, it does not get a 'fresh clock' on reindictment; rather, the time is tolled from the dismissal of the original count until the reindictment."  151 F.3d 1359, 1360 (11th Cir. 1998).

Neither case held, however, that, notwithstanding the statutory language of the STA, the date of rearraignment is irrelevant.  Rather, because the difference between reindictment and rearraignment was immaterial in these cases, they simply used "reindictment" as a shorthand.  <u>Young</u> offered the above-quoted, simplified description of the STA's rules surrounding dismissal and reindictment only as dicta in support of its holding that the filing of a superseding indictment does not reset the speedy trial clock.  528 F.3d at 1295-96.  Similarly, <u>Broadwater</u> offered the above-quoted loose dictum on its way to holding that an oral motion made on the record can constitute a "motion" for purposes of the STA.  151 F.3d at 1360-61.

Indeed, our conclusion here is supported by cases where the difference between reindictment and rearraignment was material.  In <u>United States v. Feldman</u>, for example, the Ninth Circuit explained that, "if a government motion

25

prompts dismissal of the indictment, and the defendant is later reindicted for the same offense, the original seventy day period is tolled only for the period between dismissal and reindictment or rearraignment, whichever is later." 788 F.2d 544, 548 (9th Cir. 1986). In fact, the Feldman court noted the loose language prevalent in opinions like the ones Tibbs cites. Feldman referred to another Ninth Circuit opinion "where the court held that the speedy trial clock was tolled from the date of dismissal on the government's motion until reindictment, rather than rearraignment," but, as Feldman pointed out, that opinion "was not explicit in choosing reindictment over rearraignment," and, in that opinion, "the choice of date made no difference to the applicability of the seventy day limit." Id. at 548 n.2.

In short, the district court did not err in denying Tibbs's motion to dismiss based on the STA.[7]

---

[7] Tibbs makes the somewhat related argument that the district court in case number 11cr399 (KOB) abused its discretion in not affording Tibbs the opportunity to respond before permitting the Government to dismiss Count Eighteen without prejudice. But "even where, as here, the defendant was not afforded an opportunity to contest the original dismissal, a hearing on a motion to dismiss a subsequent indictment would enable the district court to evaluate the government's reasons for dismissing a prior prosecution and afford the appellate court a sufficient record upon which to review that evaluation." United States v. Dyal, 868 F.2d 424, 428 (11th Cir. 1989). Here, Tibbs can demonstrate neither "(1) that the initial dismissal was in bad faith, [n]or (2) that [he] [was] prejudiced in his ability to attack the prosecutor's motives due to the trial court's failure to require submission of adequate reasons as a condition of dismissal of the prior prosecution." Id. (citation omitted). There is no dispute as to the Government's motives for moving to dismiss Count 18 in case number 11cr399 (KOB) and then reindicting Tibbs in case number 12cr329 (KOB): The Government realized that it had failed to present evidence to the grand jury in case number 11cr399 (KOB) to support the charge.

### III. CONCLUSION

We have considered the remaining arguments presented in appellants' briefs

and find them to be without merit.  For the reasons stated above, the judgments are

**AFFIRMED**.